# 24-2648(L)

**24-2705(XAP)**

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellant-Cross-Appellee,*

v.

RIPPLE LABS, INC.,

*Defendant-Appellee-Cross-Appellant,*

BRADLEY GARLINGHOUSE, CHRISTIAN A. LARSEN,

*Defendants-Appellees,*

(*caption continued on inside cover*)

---

On Appeal from a Final Order of the U.S. District Court
for the Southern District of New York, No. 20-cv-10832 (Torres, J.)

---

**PAGE PROOF BRIEF AND SPECIAL APPENDIX OF THE
SECURITIES AND EXCHANGE COMMISSION**

---

TRACEY A. HARDIN
*Solicitor*

JORGE G. TENREIRO
*Chief Litigation Counsel*

HOPE H. AUGUSTINI
*Senior Litigation Counsel*

DAVID D. LISITZA
*Senior Appellate Counsel*

EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-7724 (Hill)
hillez@sec.gov

JORDAN DEATON, JAMES LAMONTE, MYA LAMONTE, TYLER LAMONTE, MITCHELL MCKENNA, KRISTIANA WARNER, PHD ROSLYN LAYTON,
Intervenors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................... 3

ISSUES PRESENTED ................................................................. 3

STATEMENT OF THE CASE ...................................................... 4

    A.    The Securities Act prohibits the unregistered offer and sale of investment contracts ............................................................ 4

        1.    Securities Act registration ensures that investors have material information about their investments ........................... 4

        2.    An "investment contract"—as defined by *Howey*—is a security .................................................................................. 5

    B.    Defendants made unregistered offers and sales of XRP ....................... 8

        1.    Ripple created and fostered XRP trading markets to monetize its XRP holdings ............................................................. 8

        2.    Ripple publicly promoted XRP as an investment in Ripple's efforts to increase XRP's value ................................. 10

        3.    Defendants offered and sold over $2 billion of XRP to investors in unregistered transactions ...................................... 16

    C.    The district court granted partial summary judgment to the Commission and partial summary judgment to defendants ............... 19

        1.    The district court granted partial summary judgment in favor of the Commission with respect to Ripple's offers and sales of XRP to institutional investors .................... 20

i

2. The district court granted partial summary judgment in favor of Ripple with respect to Ripple's offers and sales of XRP to retail investors ..................................21

3. The district court granted partial summary judgment in favor of Larsen and Garlinghouse with respect to their offers and sales of XRP to retail investors ......................23

4. The district court granted partial summary judgment in favor of Ripple with respect to Ripple's offers and sales of XRP for non-cash consideration .................................. 24

D. The district court declined to certify its summary judgment order for appeal and later entered judgment for the Commission ......24

STANDARD OF REVIEW ..................................................25

SUMMARY OF ARGUMENT ...............................................26

ARGUMENT ...................................................................27

I. The district court erred in concluding that as a matter of law retail investors did not reasonably expect profits based on Ripple's public representations that it would increase XRP's price ......................27

A. XRP investors were led to expect profits based on Ripple's efforts .................................................................28

B. The district court erred in requiring that investors know that the seller is Ripple or its affiliate for investors to expect profits from the efforts of others ............................................32

1. An issuer can lead investors to expect profits from its efforts without the issuer or its affiliates making direct sales to those investors ............................................33

2. A requirement that retail investors know that they are purchasing from the issuer or its affiliates undermines the federal securities laws' protections for offers and sales that issuers make indirectly through intermediaries ......................36

ii

3. The undisputed facts demonstrate that retail investors expected profits based on Ripple's efforts regardless of whether they knew that they were purchasing from Ripple or its affiliates ................................................................ 41

C. The district court erred in distinguishing between what institutional investors and retail investors were led to expect ........... 42

II. The district court erred in concluding as a matter of law that there was no investment of money with respect to Ripple's offers and sales of XRP for non-cash consideration ................................................................ 49

CONCLUSION ................................................................................................ 55

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Audet v. Fraser*,
605 F. Supp. 3d 372 (D. Conn. 2022)..........................................................7-8, 44

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................5, 39, 48

*Berko v. SEC*,
316 F.2d 137 (2d Cir. 1963)...........................................................44

*Brandon v. Royce*,
102 F.4th 47 (2d Cir. 2024) ...........................................................25, 26

*Chris-Craft Indus., Inc. v. Bangor Punta Corp.*,
426 F.2d 569 (2d Cir. 1970)...........................................................38

*Diamond Fortress Techs., Inc. v. EverID, Inc.*,
274 A.3d 287 (Del. Super. Ct. 2022)...................................................50

*Diskin v. Lomasney & Co.*,
452 F.2d 871 (2d Cir. 1971)...........................................................37

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ...................................................................4

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019)...........................................................40

*Frisch v. Likeopedia, LLC*,
No. 23-cv-3904, 2024 WL 3938345 (S.D.N.Y. Aug. 26, 2024)...................50-51

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner &*
*Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985)................................................29, 40, 46

*Gilligan, Will & Co. v. SEC*,
267 F.2d 461 (2d Cir. 1959)...........................................................53

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974)........................................................6, 7, 29, 46

iv

*Int'l Bhd. of Teamsters v. Daniel*,
    439 U.S. 551 (1979) ...................................................................50, 51

*Jordan v. Duff & Phelps, Inc.*,
    815 F.2d 429 (7th Cir. 1987) ................................................50

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ..................................................................44

*Pino v. Cardone Cap., LLC*,
    55 F.4th 1253 (9th Cir. 2022) ..............................................38

*R.A. Holman & Co. v. SEC*,
    366 F.2d 446 (2d Cir. 1966)..................................................53

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974) ..............................................................49

*SEC v. Am. Commodity Exch., Inc.*,
    546 F.2d 1361 (10th Cir. 1976) ............................................39

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982)...................................7, 29, 43

*SEC v. Arbitrade Ltd.*,
    668 F. Supp. 3d 1290 (S.D. Fla. 2023)..................................7

*SEC v. Arthur Young & Co.*,
    584 F.2d 1018 (D.C. Cir. 1978) .............................................4

*SEC v. Balina*,
    No. 22-cv-00950, 2024 WL 2332965 (W.D. Tex. May 22, 2024) ......................7

*SEC. v. Bergin*,
    No. 13-cv-1940, 2015 WL 4275509 (N.D. Tex. Jul. 15, 2015)..........................40

*SEC v. Binance Holdings Ltd.*,
    No. 23-cv-1599, 2024 WL 3225974 (D.D.C. June 28, 2024)............................35

*SEC v. Blockvest, LLC*,
    No. 18-cv-2287, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ............................8

*SEC v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ...........................................7, 29, 34, 38, 46

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)................................................. 19, 33, 36

*SEC v. Chinese Consol. Benev. Ass'n*,
    120 F.2d 738 (2d Cir. 1940)........................................................4, 37

*SEC v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024)........................7, 31, 33, 35, 42

*SEC v. Edwards*,
    540 U.S. 389 (2004) ........................................5, 6, 7, 28, 29

*SEC v. Grybniak*,
    No. 20-cv-327, 2024 WL 4287222 (E.D.N.Y. Sept. 24, 2024)...................7, 46

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005)..............................................36

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)..................................8

*SEC v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022)...........................7, 32, 35

*SEC v. Merch. Cap., LLC*,
    483 F.3d 747 (11th Cir. 2007).............................................29

*SEC v. NAC Found., LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021).................................8

*SEC v. Payward, Inc.*,
    No. 23-cv-06003, 2024 WL 4511499 (N.D. Cal. Aug. 23, 2024).............7, 34, 42

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953).........................................................51, 53

*SEC v. Rivetz Corp.*,
    No. 21-cv-30092, 2024 WL 4892590 (D. Mass. Sept. 30, 2024) ........................7

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)....................8, 32, 44, 45, 53, 54

*SEC v. Terraform Labs Pte. Ltd.*,
    684 F. Supp. 3d 170 (S.D.N.Y. 2023)....................7, 32, 34, 41

*SEC v. Thomas D. Kienlen Corp.*,
   755 F. Supp. 936 (D. Or. 1991) .......................................................38

*SEC v. Thompson*,
   732 F.3d 1151 (10th Cir. 2013)........................................................19

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ..............................................................*passim*

*SEC v. Wahi*,
   No. 22-cv-01009, 2024 WL 896148 (W.D. Wash. Mar. 1, 2024) .......................7

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................. 6, 28

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008)........................................................6, 7, 49

*United States v. Schlisser*,
   168 F. App'x 483 (2d Cir. 2006) .......................................................49

*Uselton v. Com. Lovelace Motor Freight, Inc.*,
   940 F.2d 564 (10th Cir. 1991) ....................................................50, 51

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) .........................................................43

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) ........................................................37

*Zakinov v. Ripple Labs, Inc.*,
   No. 18-cv-06753, 2023 WL 4303644 (N.D. Cal. June 30, 2023) ..................... 44

## Statutes

Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*

   Section 2(a)(1), 15 U.S.C. § 77b(a)(1) ...............................................5-6, 39

   Section 2(a)(11), 15 U.S.C. § 77b(a)(11)...............................................36, 52

   Section 4(a)(2), 15 U.S.C. § 77d(a)(2) ...................................................36

   Section 5, 15 U.S.C. § 77e.............................................................1, 37

   Section 5(a), 15 U.S.C. § 77e(a)........................................................5, 39

Section 5(c), 15 U.S.C. § 77e(c) .................................................5, 19, 37, 39

Section 7, 15 U.S.C. § 77g ...........................................................................5

Section 11, 15 U.S.C. § 77k .........................................................................5

Section 12(a)(2), 15 U.S.C. § 77*l*(a)(2) .......................................................5

Section 20, 15 U.S.C. § 77t ........................................................................39

Section 22(a), 15 U.S.C. § 77v(a) ................................................................3

Schedule A, 15 U.S.C. § 77aa .....................................................................5

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*

Section 3(a)(10), 15 U.S.C. § 78c(a)(10) ............................................. 5-6, 39

Section 5, 15 U.S.C. § 78e ........................................................................39

Section 12(a), 15 U.S.C. § 78*l*(a) .............................................................10

Section 13(a), 15 U.S.C. § 78m(a) ..............................................................5

28 U.S.C. § 1291 .........................................................................................3

28 U.S.C. § 1292(b) ...................................................................................24

**Regulations**

17 C.F.R. § 230.215 ...................................................................................16

17 C.F.R. § 239.16b ...................................................................................51

**Miscellaneous**

H.R. Rep. No. 73-85 (1933)........................................................................38

Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 4:98
  (2024 update) ........................................................................................36

Guy P. Lander, *U.S. Securities Law for International Financial
  Transactions and Capital Markets* § 1:20 (2d ed. 2024 update) .......................40

*Registration and Reporting Requirements for Employee Benefits Plans*,
  55 Fed. Reg. 23909 (June 13, 1990) ...........................................................51

viii

**24-2648(L)**
**24-2705(XAP)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

Plaintiff-Appellant-Cross-Appellee,

v.

RIPPLE LABS, INC.,

Defendant-Appellee-Cross-Appellant,

BRADLEY GARLINGHOUSE, CHRISTIAN A. LARSEN,

Defendants-Appellees,

JORDAN DEATON, JAMES LAMONTE, MYA LAMONTE, TYLER
LAMONTE, MITCHELL MCKENNA, KRISTIANA WARNER, PHD ROSLYN
LAYTON,

Intervenors.

---

On Appeal from a Final Order of the U.S. District Court
for the Southern District of New York, No. 20-cv-10832 (Torres, J.)

---

## PAGE PROOF BRIEF OF THE
## SECURITIES AND EXCHANGE COMMISSION

---

**INTRODUCTION**

From 2013 through 2020, defendants Ripple Labs, Inc., Christian A. Larsen (Ripple's co-founder, former CEO, and current chairman), and Bradley Garlinghouse (Ripple's current CEO) together offered and sold over $2 billion of crypto asset XRP as investment contracts, a type of security. But because those offers and sales were not registered under the Securities Act of 1933, investors were deprived of the important disclosures that the federal securities laws mandate when securities are offered and sold to the public, leaving investors with only the inadequate information that Ripple unilaterally provided.

The Securities and Exchange Commission brought this civil enforcement action because that failure to register violated Section 5 of the Securities Act, 15 U.S.C. § 77e. Deciding cross-motions for summary judgment, the district court correctly concluded that Ripple's offers and sales of XRP to institutional investors were offers and sales of investment contracts. But the district court erred both factually and legally in concluding that defendants' offers and sales of XRP to public buyers who purchased on crypto asset trading platforms—including retail investors—and Ripple's offers and sales of XRP for which Ripple received non-cash consideration were not offers and sales of investment contracts.

As the Supreme Court explained in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an investment contract requires, among other things, that investors expect

1

profits from the efforts of others. The district court reasoned that institutional investors reasonably expected profits from the efforts of others because Ripple represented that its efforts would increase the price of XRP. But the district court erroneously found that retail investors did not have that same expectation because they purchased XRP through crypto asset trading platforms and thus did not know if the seller was Ripple, a Ripple affiliate, or someone else. Under *Howey*, however, whether investors are led to expect profits from the efforts of others is determined not by the identity of the seller but rather by what the offeror says and does. And what Ripple said and did was repeatedly tell institutional and retail investors alike via numerous channels—including Ripple's own website, YouTube, Reddit, online crypto asset discussion forums, and news media interviews—that Ripple's efforts would increase the price of XRP. In buying XRP, investors therefore expected to profit based on those efforts.

The district court's dichotomy between the expectations of institutional investors and those of retail investors is also inconsistent with *Howey*'s objective investor standard. And it contravenes a fundamental premise of the federal securities laws—that less sophisticated investors are no less deserving of protection than sophisticated investors.

Under *Howey*, an investment contract also requires an investment of money by investors. The district court erroneously concluded that Ripple's offers and

2

sales of XRP to Ripple employees and business partners in return for non-cash consideration failed to satisfy that requirement. But numerous courts have confirmed that non-cash consideration like that received by Ripple—labor and other services—satisfies *Howey*'s investment-of-money requirement.

This Court should vacate the district court's erroneous rulings and order summary judgment for the Commission with respect to defendants' offers and sales of XRP to retail investors and Ripple's offers and sales of XRP for which Ripple received non-cash consideration.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this civil enforcement action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). The Commission timely filed its notice of appeal from the district court's August 7, 2024 final judgment (SA35-38) on October 2, 2024 (JA__-__[DKT978]). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court erred in concluding that while Ripple's offers and sales of XRP to institutional investors were offers and sales of investment contracts, defendants' offers and sales of XRP to retail investors were not.

3

2. Whether the district court erred in concluding that Ripple's offers and sales of XRP for non-cash consideration were not offers and sales of investment contracts.

## STATEMENT OF THE CASE

### A. The Securities Act prohibits the unregistered offer and sale of investment contracts.

#### 1. Securities Act registration ensures that investors have material information about their investments.

"The Securities Act … was designed to provide investors with full disclosure of material information concerning public offerings of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). "The keystone of the Securities Act … is its substitution of a policy of disclosure for one of caveat emptor" by "clos[ing] the channels of commerce to security issues unless and until a full disclosure of the character of such securities has been made through a registration statement filed with the Commission." *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1025 n.51 (D.C. Cir. 1978), *as amended* (Sept. 14, 1978) (cleaned up). The Securities Act's registration requirements "protect the public by requiring that it be furnished with adequate information upon which to make investments." *SEC v. Chinese Consol. Benev. Ass'n.*, 120 F.2d 738, 741 (2d Cir. 1940).

Absent an exemption, Sections 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly," to "offer to sell" a security unless

4

a registration statement has been filed with the Commission or to "sell" a security unless the registration statement has become effective. 15 U.S.C. §§ 77e(a), (c). Registration requires a securities issuer to disclose information about the securities and its business operations, financial condition, results of operations, risk factors, affiliates, and management. *See id*. §§ 77g, 77aa. Having filed a registration statement and made a statutory prospectus available, an issuer must then file periodic reports under the Securities Exchange Act of 1934, which imposes "extensive disclosure requirements" to "protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988); *see, e.g*, 15 U.S.C. § 78m(a) (requiring, among other things, audited financial statements).

Thus the disclosure requirements of the federal securities laws—which are backstopped with liability for materially false statements and omissions—ensure that investors are informed about not only the benefits but also the risks of their investments. *See, e.g.*, 15 U.S.C. § 77k (registration statements); *id.* § 77*l*(a)(2) (prospectuses and oral communications).

### 2. An "investment contract"—as defined by *Howey*—is a security.

In delineating the scope of the federal securities laws, Congress "enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (cleaned up). Included in that definition is an "investment contract." 15 U.S.C.

5

§§ 77b(a)(1), 78c(a)(10).  While not statutorily defined, in *Howey* the Supreme Court held that an "investment contract" is "a contract, transaction[,] or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-99; *Edwards*, 540 U.S. at 393; *see United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975).  Because "the word 'solely' should not be construed as a literal limitation," *Howey* asks "whether, under all the circumstances, the scheme was being promoted primarily as an investment" for a "passive investor," "for whose benefits the [federal] securities laws were enacted," as opposed to an investment for which there is "significant investor control."  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (cleaned up).

In analyzing whether a contract, transaction, or scheme is an investment contract, "[f]orm [is] disregarded for substance" and "emphasis [is] placed upon [the] economic reality" based on the facts and circumstances.  *Howey*, 328 U.S. at 298; *see, e.g.*, *Leonard*, 529 F.3d at 85 (considering "the reality of the parties' positions"); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (considering "the economic reality and the totality of circumstances").  That approach "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328

U.S. at 299; *see also SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("investment contract" can reach "[n]ovel, uncommon, [and] irregular devices").

Applying *Howey*, courts have found a wide variety of contracts, transactions, and schemes to be investment contracts. *See, e.g.*, *Edwards*, 540 U.S. at 393-97 (payphone sale-and-leaseback arrangements); *Howey*, 328 U.S. at 298-300 (interests in citrus tracts); *Leonard*, 529 F.3d at 87-91 (interests in films); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 581-85 (2d Cir. 1982) (dental product licenses); *Glen-Arden*, 493 F.2d at 1034-35 (interests in whiskey casks). More recently, courts applying *Howey* have found that offers and sales of crypto assets may, depending on the facts and circumstances, be offers and sales of investment contracts. *See, e.g.*, *SEC v. Rivetz Corp.*, No. 21-cv-30092, 2024 WL 4892590, at *6-7 (D. Mass. Sept. 30, 2024); *SEC v. Grybniak*, No. 20-cv-327, 2024 WL 4287222, at *6-12 (E.D.N.Y. Sept. 24, 2024); *SEC v. Payward, Inc.*, No. 23-cv-06003, 2024 WL 4511499, at *12-17 (N.D. Cal. Aug. 23, 2024); *SEC v. Balina*, No. 22-cv-00950, 2024 WL 2332965, at *8-11 (W.D. Tex. May 22, 2024); *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 290-96 (S.D.N.Y. 2024); *SEC v. Wahi*, No. 22-cv-01009, 2024 WL 896148, at *4-7 (W.D. Wash. Mar. 1, 2024); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 193-98 (S.D.N.Y. 2023); *SEC v. Arbitrade Ltd.*, 668 F. Supp. 3d 1290, 1300-02 (S.D. Fla. 2023); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 216-21 (D.N.H. 2022); *Audet v. Fraser*, 605 F. Supp. 3d 372,

394-99 (D. Conn. 2022); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 995-97

(N.D. Cal. 2021); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177-80

(S.D.N.Y. 2020); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367-79

(S.D.N.Y. 2020); *SEC v. Blockvest, LLC*, No. 18-cv-2287, 2019 WL 625163,

at *4-9 (S.D. Cal. Feb. 14, 2019).

### B. Defendants made unregistered offers and sales of XRP.

#### 1. Ripple created and fostered XRP trading markets to monetize its XRP holdings.

In 2012, a team that included David Schwartz, who later became Ripple's

chief technology officer, programmed what is now called the "XRP Ledger,"

a blockchain (cryptographically-secured ledger) that records transactions across a

network of computers. JA__, __[DKT629 ¶¶ 10-13, 40]. The team also created a

finite supply of 100 billion "Ripples," now called "XRP," a crypto asset that

resides within the XRP Ledger as its native token. JA__-__[DKT629 ¶¶ 14, 16].

Later in 2012, Larsen, who served as Ripple's CEO through 2016 and has

chaired its board of directors since 2013, and others founded what is now Ripple.

JA__[DKT629 ¶¶ 860-61]. Ripple retained 80 billion XRP for its treasury and the

other 20 billion XRP were retained by the founders. JA__, __[DKT629 ¶¶ 15, 41].

When Ripple was founded, there was no trading market and no market price

for the 80 billion XRP that it held. JA__[DKT629 ¶ 104]. As Ripple publicly

explained, its "business model [was] predicated on a belief that demand for XRP

8

will rise (resulting in price appreciation) if the [XRP Ledger] becomes widely adopted." JA__[DKT629 ¶¶ 60-61]. To drive that demand—and an increase in XRP's price—Ripple worked to position the XRP Ledger as a payment platform that used XRP as a "bridge" to effect transactions between other assets, such as different currencies. *See, e.g.*, JA__-__[DKT629 ¶¶ 57-58, 63-76].

But developing products that utilized XRP to effect such transactions was—in Larsen's words—"extremely expensive." JA__[DKT629 ¶ 93]. That is because Ripple's products were intended "to solve a multi-trillion dollar problem – the global payment and liquidity challenges that banks, payment providers and corporat[ions] face." JA__[PX500.15]. Ripple had to create a liquid trading market for XRP so that Ripple could sell some of its XRP to generate funds for the development of XRP-related products and applications. Moreover, sufficient liquidity in the XRP market was a "precondition" to the uptake of such products. JA__-__[DKT629 ¶¶ 109-34]. That is because using XRP to effect a transfer between, for example, U.S. dollars and Mexican pesos required both someone willing to sell XRP for dollars and someone willing to buy XRP with pesos. To effect such transfers at a commercially viable scale required significant trading volume in XRP across various markets.

To jumpstart this necessary trading market, Ripple worked to get XRP listed on various crypto asset trading platforms and allocated XRP to market makers and

others to resell XRP on those platforms (none of which were registered as a securities exchange, where a security cannot be traded without an effective registration statement, *see* 15 U.S.C. § 78*l*(a)). JA__-__, __-__[DKT629 ¶¶ 479-85, 487-99, 592-605]. Ripple believed that speculative trading on those platforms would serve as the "catalyst to the XRP flywheel." JA__[DKT629 ¶ 214]; *see also, e.g.*, JA__, __, __[DKT629 ¶¶ 476, 490, 670-73]. As Garlinghouse, who joined Ripple in 2015 and became its CEO in January 2017, explained in 2019, "on XRP itself, and really I would say crypto broadly … 99.9 percent of all crypto trading is speculation today." JA__, __[DKT629 ¶¶ 42, 112].

### 2. Ripple publicly promoted XRP as an investment in Ripple's efforts to increase XRP's value.

To foster investment interest in XRP, Ripple conducted a relentless, years-long, multi-channel, public marketing campaign that touted its efforts to increase XRP's value and promoted XRP as an opportunity to invest in—and financially benefit from—the enterprise developed by Ripple's efforts.

In numerous public statements, Ripple promoted the efforts that it was undertaking to enhance XRP's value. *See* JA__-__[PX500]. For example, Ripple's website stated that Ripple was "a responsible steward of XRP supply" and that it had "demonstrated a tremendous track record of investing in and supporting the XRP ecosystem." JA__[PX500.15]. And starting in 2016, Ripple's website also included quarterly "XRP Markets Reports." Ripple explained that it was

10

issuing the XRP Markets Reports as "part of being a responsible stakeholder" and that the reports were intended to "continually improve the health of XRP markets globally" by providing updates on the "state of the market." JA__, __-__[DKT629 ¶¶ 267-68, 500-02, 504-11]. The XRP Markets Reports stated, for example, that:

- Ripple had started an initiative called "xPring" to "develop use cases for XRP" (JA__[DKT629 ¶ 364]; *see infra* 18);

- Ripple was "accelerating the pace of [its] investment in the XRP Ledger" (JA__-__[DKT629 ¶ 509]);

- Ripple was "expand[ing] [its] partnerships" to promote "usage of XRP as a liquidity solution for more and more corridors" (JA__-__[PX501.04]); and

- "[The] increased global reach [of XRP was] the result of Ripple's continued investment in the XRP ecosystem" (JA__-__[PX501.05]; *see also* JA__-__[PX501]).

Key Ripple executives also repeatedly publicly touted Ripple's efforts to make XRP a profitable investment. *See* JA__-__, __-__[PX502, PX506]. For example, in 2013, Schwartz wrote on Bitcoin Forum that Ripple "do[es]n't currently plan to do anything but develop and promote the Ripple payment network" to "increase the value and liquidity of XRP." JA__, __[DKT629 ¶¶ 117, 202]; *see also* JA__-__[PX507]. And in 2017 he wrote on XRP Chat ("The Largest XRP Crypto Community Forum") that XRP investors realized a "huge advantage" from Ripple holding a "significant fraction" of XRP because "Ripple could spend $100 million on something that has no conventional way of creating

11

revenue, but if it pushed the price of XRP up by one penny over the long term, Ripple would massively profit." JA__, __[DKT629 ¶¶ 77, 438]; *see also* JA__-__[PX508].

Garlinghouse himself stated in a 2017 video available on YouTube that Ripple was "just getting started" and that Ripple would "continue to work with exchanges globally and market makers, making sure [it was] doing everything [it could] to make XRP successful on a liquidity basis," and "investing in other use cases for the XRP ledger." JA__-__[DKT629 ¶ 467]. He stated at a 2018 press conference that "Ripple is very, very interested in the success and the health of the [XRP] ecosystem and will continue to invest in the ecosystem." JA__[DKT629 ¶ 469]. In a 2020 interview, he stated that "[Ripple] own[s] a lot of XRP. So do I care about the overall XRP market? 100 per[]cent." JA__-__[DKT629 ¶ 252]. And Garlinghouse explained in a 2018 interview with Yahoo Finance that Ripple would "do things to invest in the success of the XRP ecosystem because that's in [Ripple's] best interest" as "the most interested party in the success of the XRP ecosystem." JA__-__[PX503.09].

Ripple also promoted the ability of its team to enhance XRP's value. On its website, Ripple explained that it was attracting a "diverse set of talented individuals with experience in relevant technology and financial services companies." JA__[DKT629 ¶¶ 60-61]. And posting on the social networking

12

platform Reddit, Schwartz wrote that what "really set[s] XRP apart from any other digital asset" was that, among other things, Ripple had "[an] amazing team of dedicated professionals that Ripple ha[d] [managed] to amass to develop an ecosystem around XRP." JA__[DKT629 ¶ 345]; *see also, e.g.*, JA__[DKT629 ¶ 435]; JA__-__[DKT629 ¶ 439].

The public marketing campaign also emphasized that XRP could be bought and sold on crypto asset trading platforms and that Ripple would continue working to improve XRP liquidity. For example, Ripple's website included a list of the crypto asset trading platforms on which XRP was listed and the XRP Markets Reports provided updates on new listings. JA__-__[DKT629 ¶¶ 511, 516-17]. The XRP Markets Reports explained that "Ripple play[ed] a responsible role" with respect to XRP liquidity, which included "be[ing] a buyer in the secondary market" and reducing or pausing its XRP sales to stabilize XRP's price. JA__[DKT629 ¶¶ 584-89].

Ripple also tied its efforts to XRP's price. For example, in a 2014 interview, Larsen stated that "if the protocol is successful [the] digital asset will almost definitionally be successful as well" because "[l]ong term primary use" is "the most important source of demand." JA__[DKT629 ¶ 377]. In 2015, Ripple posted on XRPTalk that "[w]hat affects XRP price long-term is adoption of the [Ripple] protocol and growth of the ecosystem." JA__[DKT629 ¶ 378]. In a 2017

13

Bloomberg interview posted to YouTube, Garlinghouse stated that "the more utility you can derive from [XRP,] the more use case[s] you can derive, the more valuable they'll be." JA__[DKT629 ¶ 387]. And in a 2017 post on social question and answer website Quora, Schwartz explained that Ripple was working to increase adoption of XRP "to increase demand for XRP to increase the value we can extract from our stash of XRP." JA__-__[DKT629 ¶ 388].

Attempting to quantify what Ripple's efforts meant for XRP investors, in a 2017 Reddit post, Schwartz wrote that "Ripple [was] targeting XRP at eliminating inefficiency in international payments," and, if successful, XRP's price would increase to "roughly $20" or perhaps even "higher." JA__[DKT629 ¶ 389]. And in a 2020 interview, a Ripple executive stated that XRP could "outperform" other investments by 15% if it achieved "3% exposure" to the "trillions" of dollars of market opportunity that XRP was "solving for." JA__, __[DKT629 ¶¶ 55, 455].

When XRP's price increased from $0.0064 to $2.30 in 2017, Ripple publicly proclaimed that the increase was proof that its efforts were increasing XRP's price. JA__-__[DKT629 ¶¶ 400-06, 408-20]. For example, in an interview with website CoinDesk, Garlinghouse stated that the "significant rally in XRP prices" was "reflective of a lot of work we have done to make Ripple a very compelling solution." JA__-__[PX502.08]. In an interview with CNBC, he stated that "[p]eople are looking at the success Ripple has been having as a company, and I

14

think that's increased the value of XRP."  JA__-__[PX502.04]; *see also*, *e.g.*,

JA__[DKT629 ¶ 435].  And Ripple's XRP Markets Reports tied the increase in

XRP's price to "key developments" that included Ripple's efforts to spur adoption

of XRP.  JA__-__[DKT629 ¶¶ 421-24].

Ripple also publicly touted its efforts to prevent XRP's price from rapidly

decreasing.  Ripple announced its creation of a cryptographic "escrow" account

that purportedly limited Ripple's ability to liquidate its XRP stake.  JA__[DKT629

¶¶ 308-09].  According to Ripple's public announcement, the escrow

"underscore[d] Ripple's commitment to building XRP liquidity and a healthy and

trusted market," including because it precluded Ripple from crashing XRP's price

by selling large quantities into the market and because it further aligned Ripple's

fortunes with investors' fortunes.  JA__[PX500.15].

Evidence demonstrated that, as a result of Ripple's public marketing

campaign, investors viewed XRP as an investment in Ripple's enterprise dedicated

to increasing demand for and the value of XRP.  *See, e.g.*, JA__-__[DKT629

¶¶ 877-902].  By 2017, "How to buy XRP" had increased in frequency to become

the "most common type of request" for Ripple's customer support.  JA__[DKT668

¶ 397].  Ripple, for its part, directed "investment[] inquiries" to its "guide to

getting XRP" webpage, which contained links on "how to buy XRP."

JA__[DKT629 ¶ 608].  And it was not only investors that understood XRP to be an

15

investment in Ripple's managerial and entrepreneurial efforts to increase XRP's price. *See, e.g.*, JA__-__[DKT629 ¶¶ 903-13]. Indeed, in many instances "XRP" and "Ripple" were treated as synonymous. *See, e.g.*, JA__-__[DKT629 ¶¶ 914-22]; *see also* JA__-__[DKT629 ¶ 450] (The Wall Street Journal referring to an increase in the price of XRP as "Ripple's 1,184% surge"). Garlinghouse himself stated in a 2017 Bloomberg interview that "XRP … is Ripple's digital asset." JA__[DKT629 ¶ 387].

### 3. Defendants offered and sold over $2 billion of XRP to investors in unregistered transactions.

Throughout the period in which Ripple was taking steps to increase demand for XRP based on promised efforts to increase XRP's value, defendants offered and sold XRP to investors.

From late 2013 through 2020, Ripple offered and sold approximately $728.9 million of XRP to institutional and other accredited investors in unregistered transactions. JA__[DKT629 ¶ 716]; *see* 17 C.F.R. § 230.215 ("accredited investor"). And between November 2014 and September 2019, Ripple offered and sold approximately $757 million of XRP to public buyers—including retail investors—who purchased in unregistered transactions on crypto asset trading platforms that did not disclose the identity of the seller. JA__-__[DKT629 ¶¶ 647, 652].

From at least 2013 through 2020, Larsen, who retained nine billion XRP when Ripple was founded, offered and sold XRP on crypto asset trading platforms in unregistered transactions, making approximately $450 million from those sales. JA__[DKT629 ¶ 868]. And from 2017 through 2020, Garlinghouse, who received XRP as executive compensation, offered and sold approximately $150 million of XRP in unregistered transactions on crypto asset trading platforms. JA__-__, __[DKT629 ¶¶ 844-49, 870]. Garlinghouse's sales included selling millions of dollars of XRP to retail investors on crypto asset trading platforms at the same time that Ripple was—at Garlinghouse's behest—purchasing XRP in the secondary market in order to maintain and/or increase XRP's price. *See, e.g.*, JA__-__[DKT629 ¶ 777-78]. Indeed, Garlinghouse was selling XRP while publicly stating "I'm long XRP. I'm very, very long XRP as a percentage of my personal … balance sheet." JA__[DKT629 ¶ 1145].

Ripple also offered and sold more than 1.5 billion XRP in unregistered transactions for consideration other than cash, with an understanding that the various recipients would further distribute the XRP into the public markets. JA__-__[DKT629 ¶¶ 827-43]. From 2013 through 2020, Ripple obtained more than

17

$609 million in revenue from three types of non-cash XRP transactions. JA__[DKT629 ¶ 147]; JA__[DKT668 ¶¶ 141].

*First*, from 2014 through 2020, Ripple paid employees XRP in exchange for their labor. JA__-__, __-__[DKT629 ¶¶ 217-18, 844-59]. For example, Ripple's head of product development was paid bonuses in XRP. JA__, __[DKT629 ¶¶ 46, 854].

*Second*, Ripple gave XRP to business partners that provided services to Ripple. *See, e.g.*, JA__[DKT629 ¶¶ 829]. For example, Ripple allotted XRP to MoneyGram International, Inc. to incentivize MoneyGram's use of a Ripple software product. *See, e.g.*, JA__, __, __[DKT668 ¶¶ 177, 213, 455].

*Third*, as part of its "xPring" initiative, Ripple supplied at least 776 million XRP to business partners supporting the development of XRP applications. JA__, __[DKT629 ¶¶ 260, 831-34]. For example, Ripple distributed XRP to Coil Technologies, Inc. to "perform certain development services to promote technologies of interest to Ripple." JA__[DKT668 ¶¶ 85-86]; *see also* JA__-__[DKT668 ¶¶ 110-32].

All told, Ripple, Larsen, and Garlinghouse together offered and sold over $2 billion of XRP in unregistered transactions.

18

**C.      The district court granted partial summary judgment to the Commission and partial summary judgment to defendants.**

The Commission brought this civil law enforcement action, alleging that defendants violated Sections 5(a) and (c) of the Securities Act by offering and selling unregistered XRP, and also that Larsen and Garlinghouse aided and abetted Ripple's Section 5 violations.  JA__-__[DKT46].  To prove a violation of Section 5, the Commission must show that no registration statement was filed when a security was offered or was effective when a security was sold, and that the defendant directly or indirectly offered or sold the security through interstate commerce.  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

Following discovery, the Commission and defendants cross-moved for summary judgment.  It is undisputed that defendants utilized the means of interstate commerce and that no registration statement filed.  SA10.  The district court's summary judgment order therefore focused on the question of whether defendants' offers and sales of XRP were investment contracts under *Howey.*  The district court concluded that this was a "legal question" that it could "resolve[] based on the undisputed record."  SA15; *see SEC v. Thompson*, 732 F.3d 1151, 1160-61 (10th Cir. 2013) ("[W]hether an instrument is a security is a question of law and not of fact.") (cleaned up).

19

### 1. The district court granted partial summary judgment in favor of the Commission with respect to Ripple's offers and sales of XRP to institutional investors.

With respect to institutional investors—"sophisticated individuals and entities" —the district court concluded that Ripple offered and sold investment contracts. SA16-22. There was an investment of money because the investors "invested money by providing fiat or other currency in exchange for XRP." SA16. There was a common enterprise because (a) Ripple "pooled the proceeds of its [i]nstitutional [s]ales," (b) "Ripple used the funds it received from its [i]nstitutional [s]ales to promote and increase the value of XRP by developing uses for XRP and protecting the XRP trading market," and (c) accordingly, each institutional investor's "ability to profit was tied to Ripple's fortunes and the fortunes of other [institutional investors]." SA17-18. Finally, "reasonable [institutional] investors … would have purchased XRP with the expectation that they would derive profits from Ripple's efforts." SA18-22.

In finding that institutional investors expected to profit from Ripple's efforts, the district court pointed to Ripple's public marketing campaign, including that Ripple "touted XRP as an investment tied to the company's success," that Ripple "connect[ed] XRP's price and trading to [Ripple's] own efforts," and that "Ripple's senior leaders [made] similar statements on various public channels." SA18-21. The district court also pointed to certain lockup provisions and resale restrictions

20

that some institutional investors agreed to in purchasing XRP as "inconsistent with the notion that XRP was used as a currency or for some other consumptive use," rather than purchased for profit. SA21-22. The district court concluded that "[f]rom Ripple's communications, marketing campaign, and the nature of the [i]nstitutional [s]ales, reasonable investors would understand that Ripple would use the capital received from its [i]nstitutional [s]ales to improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP." SA19.

The district court thus granted the Commission partial summary judgment with respect to Ripple's offers and sales of XRP to institutional investors.[1]

### 2. The district court granted partial summary judgment in favor of Ripple with respect to Ripple's offers and sales of XRP to retail investors.

With respect to Ripple's offers and sales to retail investors, the district court reached the opposite conclusion. The district court found that Ripple's offers and

---

[1] The district court denied Larsen and Garlinghouse summary judgment on the aiding and abetting claim, finding that there were issues of fact as to their knowledge or reckless disregard of Ripple's Section 5 violations with respect to institutional offers and sales and as to Larsen's substantial assistance with respect to certain institutional offers and sales. SA30-33. Thereafter, the parties entered into a stipulation dismissing with prejudice the Commission's claim that Garlinghouse and Larsen aided and abetted Ripple's violations of Section 5 with respect to institutional offers and sales. JA__-__[DKT921]. But if this Court determines that Ripple violated Section 5 with respect to its offers and sales to retail investors, the district court would still need to determine whether Larsen and Garlinghouse aided and abetted those violations. *See infra* 55.

21

sales to "public buyers … on digital asset exchanges" did not satisfy *Howey*'s expectation-of-profits requirement and thus granted Ripple partial summary judgment with respect to its offers and sales to retail investors. SA22-25. The district court concluded that retail investors "could not reasonably expect" "that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP." SA23. The district court reasoned that because Ripple's sales to retail investors were "blind bid/ask transactions," retail investors "could not have known if their payments of money went to Ripple" and "Ripple did not make any promises or offers" to those investors "because Ripple did not know who was buying the XRP." SA23-34.

The district court also found that Ripple's offers and sales to retail investors "lacked other factors present in the economic reality" of Ripple's offers and sales to institutional investors that "cut in favor of finding" *Howey*'s expectation-of-profits requirement satisfied. SA24. First, the sales to retail investors "were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." SA24. Second, while two of "Ripple's promotional materials" were "widely circulated" among institutional investors, the district court found that "there is no evidence that th[o]se documents were distributed to the general public." SA24-25. Third, the district court found that there was no evidence that retail investors "understood that statements made

22

by Larsen, Schwartz, Garlinghouse, and others were representations of Ripple and its efforts." SA25. Finally, the district court found that while the institutional investors "were sophisticated entities" that "would have been aware of Ripple's marketing campaign and public statements connecting XRP's price to [Ripple's] own efforts," "[t]here is no evidence that a [retail investor], who was generally less sophisticated as an investor, shared similar understandings and expectations and could parse through" the public marketing campaign. SA25 (cleaned up).

### 3. The district court granted partial summary judgment in favor of Larsen and Garlinghouse with respect to their offers and sales of XRP to retail investors.

With respect to Larsen's and Garlinghouse's personal offers and sales to retail investors, the district court similarly concluded that they did not satisfy *Howey*'s requirement of an expectation of profits based on the efforts of others and thus granted Larsen and Garlinghouse partial summary judgment. SA27-28. The district court reasoned that, like Ripple's offers and sales to retail investors, "Larsen's and Garlinghouse's XRP sales were … on … digital asset exchanges through blind bid/ask transactions," and that because "Larsen and Garlinghouse did not know to whom they sold XRP, and the buyers did not know the identity of the seller," "as a matter of law, the record cannot establish the [expectation-of-profits requirement] as to th[o]se transactions." SA27.

23

**4.      The district court granted partial summary judgment in favor of Ripple with respect to Ripple's offers and sales of XRP for non-cash consideration.**

The district court recognized that Ripple's offers and sales of XRP for non-cash consideration "include[d] distributions to employees as compensation and to third parties … to develop new applications for XRP and the XRP Ledger," and that Ripple recorded what it received in exchange for those sales as "consideration other than cash." SA26 (cleaned up). But the district court nonetheless found that those offers and sales "d[id] not satisfy *Howey*'s [requirement] that there be an investment of money" because "*Howey* requires a showing that the investors provided the capital, put up their money, or provided cash" and "the record shows that recipients … did not pay money or some tangible and definable consideration to Ripple." SA26 (cleaned up). The district court thus concluded that those offers and sales "did not constitute the offer and sale of investment contracts" and granted Ripple partial summary judgment. SA27.

**D.      The district court declined to certify its summary judgment order for appeal and later entered judgment for the Commission.**

On October 3, 2023, the district court denied the Commission's motion pursuant to 28 U.S.C. § 1292(b) for certification to appeal the summary judgment

order's grant of partial summary judgment in favor of defendants.  JA__-__[DKT917].

On August 7, 2024, the district court granted in part and denied in part the Commission's motion for entry of final judgment against Ripple.  JA__-__[DKT973].  The district court granted the Commission's request to permanently enjoin Ripple from future violations of Section 5, but it denied the Commission's request for a conduct-based injunction prohibiting Ripple from engaging in any unregistered institutional offers and also denied the Commission's request for disgorgement of Ripple's net profits from institutional sales.  Finally, concluding that a per-violation penalty at the first-tier maximum was appropriate and finding that 1,278 institutional sales violated Section 5, the district court imposed a total civil penalty of $125,035,150.[2]

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*.  *See, e.g.*, *Brandon v. Royce*, 102 F.4th 47, 54 (2d Cir. 2024).  "Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the

---

[2]  If defendants are found liable with respect to the offers and sales as to which the district court granted defendants partial summary judgment, the district court would have the opportunity to consider further injunctive relief and additional monetary remedies—including disgorgement and/or civil penalties with respect to the more than $1 billion defendants obtained from those offers and sales. *See infra* 55.

movant is entitled to judgment as a matter of law." *Id.* (cleaned up). "In determining whether there are genuine disputes of material fact, [this Court is] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* (cleaned up).

## SUMMARY OF ARGUMENT

1. The district court's conclusion that an investor cannot reasonably expect profits from the efforts of an issuer unless the investor knowingly purchases the investment from that issuer or its affiliate is contrary to both applicable law and the undisputed facts. It finds no support in *Howey*, which focuses on the economic reality of the transaction rather than the identity of the seller. And it is contrary to foundational provisions of the federal securities laws, including those that prohibit issuers from engaging in the unregistered offer and sale of securities directly or indirectly through conduits. The district court's conclusion is also irreconcilable with the undisputed facts regarding Ripple's extensive public marketing campaign about its efforts to increase XRP's price.

The district court further erred in drawing a dichotomy between the expectations of institutional investors and those of retail investors. The district court's assumption that only a "sophisticated" investor would have been aware of Ripple's representations that its efforts would increase the price of XRP cannot be squared with Ripple's public marketing campaign, which specifically engaged

"less sophisticated" investors. In these circumstances, the distinctions that the district court drew between those groups of similarly situated investors contravenes the objective investor standard established in *Howey*.

2. The district court granted Ripple partial summary judgment with respect to its offers and sales of XRP for non-cash consideration based on the erroneous conclusion that Ripple had not received an investment of money in exchange for that XRP. But the consideration that Ripple undisputedly received—labor and other services—satisfies *Howey*'s investment-of-money requirement.

## ARGUMENT

**I.    The district court erred in concluding that as a matter of law retail investors did not reasonably expect profits based on Ripple's public representations that it would increase XRP's price.**

The fundamental premise of the district court's rulings as to defendants' offers and sales to retail investors is that XRP investors cannot have been led to expect profits based on the efforts of others unless the investors knew that they were purchasing XRP directly from Ripple or its affiliates. But under *Howey*, whether investors were led to expect profits is based not on the identity of the seller but on the economic reality of what the issuer said and did in offering the investment. And while the district court distinguished between what institutional investors and retail investors were led to expect, *Howey* imposes an objective investor standard and Ripple's public marketing campaign targeted and reached

27

both institutional investors and retail investors. Ripple publicly promised that it would create a rising tide that would lift the price of XRP for all investors, whether having purchased from Ripple, its affiliates, or a third party. Based on these promises, a reasonable investor would have anticipated that increases in the price of XRP were the result of Ripple's efforts. And the district court's ultimate conclusion—that registration and its accompanying disclosures were required for offers and sales to "sophisticated" investors but not for offers and sales to "less sophisticated" investors—turns the protective purpose of the federal securities laws on its head.

### A.    XRP investors were led to expect profits based on Ripple's efforts.

*Howey* asks whether an investor reasonably expected profits from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852. An expectation of profits exists when investors invest because of "the prospects of a return on their investment[s]." *Howey*, 328 U.S. at 300. That includes "[an] increased value of the investment"—profit distributions are not required. *Edwards*, 540 U.S. at 394. What matters is "whether the typical investor who was being solicited would be expected under all the circumstances to … remain[]

passive and deriv[e] profit from the efforts of others." *Aqua-Sonic*, 687 F.2d at 582-83.

In determining what investors were "led to expect," *Howey*, 328 U.S. at 299, courts analyze "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect" in any medium. *Joiner*, 320 U.S. at 353; *see id.* at 346 (considering "sales campaign" and "sales literature"); *Howey*, 328 U.S. at 296-97 (considering what was "represented" to investors, including via "advertising" and "a sales talk"); *Edwards*, 540 U.S. at 392 (considering a brochure and other "marketing materials" and "Web site" representations); *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 756, 760 (11th Cir. 2007) (considering "all the representations made by the promoter in marketing the interests, not just … the legal agreements"); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985) (considering the issuer's "implicit promise to maintain its marketing efforts"); *Glen-Arden*, 493 F.2d at 1031, 1034-35 (considering "sales literature," including "fancy brochures touting [the] investment plan," and "a canned sales pitch").

Here, Ripple's public representations that it was working to increase the price of XRP invited all investors—retail and institutional alike, regardless of whether they knew that they were purchasing XRP from Ripple—to expect profits (through an increase in XRP's price) from Ripple's efforts. Ripple explained—

including on its website, on social networking platforms, in interviews in international publications, and on television and YouTube—that its entire business plan was to increase XRP's price by increasing the demand for XRP. *See supra* 8-9, 10-16. As Schwartz, Ripple's chief technology officer, put it in an online discussion forum post, Ripple "do[es]n't currently plan to do anything but develop and promote the Ripple payment network" to "increase the value and liquidity of XRP." *See supra* 11.

Ripple also publicly touted its past, current, and future efforts to increase demand for XRP to increase XRP's price. *See supra* 10-16. For example, Ripple's XRP Markets Reports—published on Ripple's website—provided quarterly updates regarding Ripple's efforts to grow demand for XRP. *See supra* 10-11. And Garlinghouse explained on YouTube that Ripple was "doing everything [it could] to make XRP successful on a liquidity basis," including "investing in other use cases." *See supra* 12.

In addition, Ripple publicly promoted its ability—and the expertise of its employees—to drive demand for XRP. *See supra* 10-16. For example, Schwartz wrote on Reddit that Ripple stood out from other crypto companies due to its "amazing team" that was "develop[ing] an ecosystem around XRP." *See supra* 12-13. And Ripple publicly connected its efforts to increase demand for XRP to increases in XRP's price—including Garlinghouse stating in an interview that such

30

an increase was "reflective" of Ripple's work. *See supra* 14-15. Ripple similarly publicly promoted its efforts to develop and stabilize an XRP secondary trading market—including by escrowing some of its XRP stash—which created the liquidity necessary for investors to realize gains derived from Ripple's efforts. *See supra* 13, 15. Finally, Ripple cast its efforts as technologically complex, expensive, and time-consuming. *See supra* 9, 10-16. For example, Garlinghouse stated in 2017 that Ripple was "just getting started" on its long-term goals and plans with respect to XRP, and Ripple described what it sought to solve as a "multi-trillion-dollar" problem (*i.e.*, one that an investor would be relying on others to address). *See supra* 9, 12.

As a result of those representations, all XRP investors—not just institutional investors who purchased XRP knowingly from Ripple—reasonably expected profits from Ripple's efforts to increase the price of XRP. Representations on Ripple's website and social networking platforms and in news reports, for example, were equally accessible to retail and institutional investors alike. And, as other district courts have correctly concluded, such representations lead investors to expect profits based on others' efforts. *See, e.g., Coinbase*, 726 F. Supp. 3d at 292 (concluding that "[t]he SEC has plausibly alleged that issuers and promoters … — through websites, social media posts, investor materials, town halls, and other fora—repeatedly encouraged investors to purchase tokens by advertising the ways

in which their technical and entrepreneurial efforts would be used to improve the value of the asset"); *Terraform*, 684 F. Supp. 3d at 196 (concluding that a crypto asset issuer's "social media posts" and "monthly investor reports" touting its "investing and engineering experience" were sufficient to create an expectation of profits); *Telegram*, 448 F. Supp. 3d at 372 (concluding that an expectation of profits was sufficiently established through, among other things, evidence that the crypto asset issuer promoted its ability to support the asset's market price); *LBRY*, 639 F. Supp. 3d at 220 (concluding that an expectation of profits was sufficiently proven by the crypto asset issuer "signal[ing] that it was motivated to work tirelessly to improve the value of its blockchain for itself and any … purchasers").

### B. The district court erred in requiring that investors know that the seller is Ripple or its affiliate for investors to expect profits from the efforts of others.

The district court relied heavily on its determination that—while institutional investors "knowingly purchased XRP directly from Ripple" (SA23)—retail investors did not know "if their payments of money went to Ripple" or if "they were buying XRP from Ripple" (SA23-24). But there is no support for a rule that an investor needs to know that she is purchasing from an issuer or its affiliates for the investor to expect profits from the efforts of others. Such a rule would be contrary to the federal securities laws. And a determination that retail investors in particular could not expect profits from Ripple's efforts without knowing that they

were purchasing from Ripple or its affiliates is belied by the undisputed facts of Ripple's public marketing campaign. Moreover, the need for registration of offers and sales by Larsen and Garlinghouse, control persons of Ripple, was just as acute as for offers and sales by Ripple itself. *Cavanagh*, 445 F.3d at 111 n.12 ("A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities.") (cleaned up).

### 1. An issuer can lead investors to expect profits from its efforts without the issuer or its affiliates making direct sales to those investors.

*Howey* does not require that "an investor bought [crypto assets] directly from an issuer … as a necessary element in its test of whether a transaction constitutes an investment contract." *Coinbase,* 726 F. Supp. 3d at 293. Rather, *Howey* is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299. Yet under the district court's approach, *Howey* could easily be evaded by disguising the seller's identity, routing purchases through an intermediary, or simply offering investments on markets that do not involve face-to-face transactions.

*Howey*'s expectation-of-profits requirement "makes no … distinction" between purchases from the issuer and those from third parties because the seller's

33

identity "has no impact on whether a reasonable individual would objectively view the [issuer's] actions and statements as evincing a promise of profits based on [the issuer's] efforts." *Terraform*, 684 F. Supp. 3d at 197. Rather, the inquiry turns on what investors are "led to expect," *Howey*, 328 U.S. at 301, which is determined by the "economic reality," *id.* at 298, of "the economic inducements held out to the prospect," *Joiner*, 320 U.S. at 353. Because what an investor is led to expect turns on those economic realities and on what the issuer says and does—and not whether the issuer or its affiliate is the seller—an investor can be led to expect profits regardless of the identity of the seller. The district court did not—and could not—reconcile its contrary conclusion with *Howey*.

Indeed, no other case applying *Howey* has required that an investor know that she is purchasing from the issuer or its affiliates for the investor to expect profits from the efforts of others. District courts in this circuit and elsewhere have rejected any such requirement and have found that investors who purchase crypto assets on secondary trading platforms—*i.e.*, without knowing the identity of the seller—have an expectation of profits based on the efforts of others. *E.g.*, *Terraform*, 684 F. Supp. 3d at 197 (expressly "reject[ing] the approach" of this district court as to retail investors); *Payward, Inc.*, 2024 WL 4511499, at *11 ("That a transaction does not involve the asset's primary issuer does not foreclose the possibility that the primary issuer's representations follow the asset through to

34

the secondary market."); *Coinbase*, 726 F. Supp. 3d at 293 ("[T]he manner of sale has no impact on whether a reasonable individual would objectively view the issuers' actions and statements as evincing a promise of profits based on their efforts.") (cleaned up); *LBRY*, 639 F. Supp. 3d at 217-21 (impersonal sales by an issuer on a trading platform satisfied *Howey*'s expectation-of-profits requirement).[3]

Purchasers who know the identity of the seller and those who do not are equally dependent on an issuer's representations of efforts to generate profits. Neither the source of the crypto asset that an investor purchases nor the investor's lack of knowledge about the identity of the seller determines the economic reality of what is purchased as those facts do not impact what the issuer leads investors to expect. XRP purchased knowingly from Ripple or its affiliates is the same as XRP purchased blindly from Ripple or its affiliates—or from a third party.

---

[3] While in *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599, 2024 WL 3225974 (D.D.C. June 28, 2024), the court concluded that the Commission had failed to allege that *all* trading platform transactions in a particular crypto asset were securities transactions, the court appeared to premise this conclusion on a supposed failure of pleading sufficient facts to establish an expectation of profits in secondary-market purchasers rather than on a requirement that an investor know the identity of the seller. *Id.* at *22 & n.16. Indeed, the court expressly acknowledged that secondary-market, crypto-asset transactions could, depending on their facts and circumstances, be securities transactions. *Id.* at *20. The Commission subsequently filed an amended complaint with additional allegations related to trading platform transactions and the defendants' motion to dismiss the amended complaint is pending.

### 2. A requirement that retail investors know that they are purchasing from the issuer or its affiliates undermines the federal securities laws' protections for offers and sales that issuers make indirectly through intermediaries.

Requiring an investor to know that the seller of an investment contract is the issuer or its affiliate would eviscerate several core provisions of the statutory registration regime. It would also permit unregistered offers and sales of investment contracts made through intermediaries to avoid the reach of the federal securities laws, including their registration and antifraud provisions.

*First*, requiring the public to know that an offer or sale was made by the issuer would permit issuers to structure otherwise unlawful transactions of unregistered securities through "underwriters" who "purchased from an issuer with a view to, or offers or sells for an issuer in connection with," a distribution of those securities to the public. 15 U.S.C. § 77b(a)(11); *see id.* § 77d(a)(2); *see, e.g., Cavanagh*, 445 F.3d at 111-16 (affirming summary judgment on Commission's Section 5 claims for unlawful distribution through underwriters); *SEC v. Kern*, 425 F.3d 143, 152–53 (2d Cir. 2005) (same). But Congress enacted that broad definition of "underwriter" to prohibit such conduct by "all persons who might operate as conduits for securities being placed into the hands of the investing public." Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 4:98 (2024 update).

36

Moreover, an issuer is prohibited from unregistered offers and sales that are "direct[] or *indirect*[]." 15 U.S.C. § 77e (emphasis added). But if an investor must know that the seller is the issuer or its affiliate for the investor to expect to profit, that prohibition on indirect offers and sales would be rendered meaningless for investment contracts. And a public offering is not limited to the last stage of a distribution in which the security is sold to the public. Rather, liability under Section 5 covers all participants "who are engaged in steps necessary to the distribution of security issues." *Chinese Consol.*, 120 F.2d at 741.

*Second*, "offer[s] to sell" unregistered securities are prohibited, 15 U.S.C. § 77e(c), and Congress did not limit offers or "solicitations to personal or individualized ones," *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345 (11th Cir. 2022) (cleaned up). Rather, "a person offers a security every time he makes … a solicitation of an offer to buy … a security for value," including "communications made through diffuse, publicly available means," like "social media posts, … online videos, and web links." *Id.* at 1345-46 (cleaned up). "A seller cannot dodge liability through his choice of communications—especially when the [Securities] Act covers any means of communication," and to conclude otherwise would "contradict[] the text and allows easy end-runs around the Act." *Id.* at 1346 (cleaned up); *see also Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (offers reached by Section 5 include "oral communication[s]" and

"tombstone ad[s]") (cleaned up); *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022) ("[A] person can solicit a purchase, within the meaning of the Securities Act, by promoting the sale of a security in a mass communication."). Imposing a requirement for sales that does not exist with respect to offers would incongruously narrow Section 5's reach when sales are consummated, as opposed to when offers, which "condition[] the public mind," are made. *SEC v. Thomas D. Kienlen Corp.*, 755 F. Supp. 936, 940 (D. Or. 1991).

Moreover, as *Howey* explains, "[t]he Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities." 328 U.S. at 301. The required registration of an offering is intended to ensure that offerees can "check the accuracy of the information which forms the basis of the offeror's estimate of value" of securities at the time the offerees are being solicited. *Chris-Craft Indus., Inc. v. Bangor Punta Corp.*, 426 F.2d 569, 574-75 (2d Cir. 1970); *see Joiner*, 320 U.S. at 347 (fraud in solicitations); *see also* H.R. Rep. No. 73-85, at 7-8 (1933) (explaining that the "waiting period" between registration statement filing and effectiveness "is deliberately intended to interfere with the reckless traditions of the [pre-Securities Act] securities business"). Requiring an investor to know that she is purchasing from the issuer or its affiliates assumes the existence of a particular transaction before there can be an investment contract or liability, which would render Section 5's prohibition on unregistered offers meaningless.

Registration informs (and thus protects) investors before they part with their money, and the Commission is authorized to enjoin illegal offerings even before a purchase is consummated. *See, e.g.*, *SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1366 (10th Cir. 1976); *see also* 15 U.S.C. § 77t.

*Third*, the federal securities laws use the same term—"investment contract"—to define "security," 15 U.S.C. §§ 77b(a)(1), 78c(a)(10), when someone "sell[s]" a security, *id.* §§ 77e(a), and when someone "effect[s] any transaction" in a security on an "exchange," *id.* § 78e. A requirement that an investor know that the seller is the issuer or its affiliate for the investor to have an expectation of profits would thus render unregistered sales of investment contracts conducted over exchanges—which are generally impersonal—beyond the reach of the federal securities laws. *See Basic*, 485 U.S. at 243–44 (observing that "[t]he modern securities markets," in which "millions of shares chang[e] hands daily," "differ from [traditional] face-to-face transactions."). But the risks of manipulation, fraud, and other abuses that the federal securities laws seek to prevent are not limited to direct sales from the issuer or its affiliates, and the district court's direct sale requirement would be a green light for fraud on retail investors purchasing investment contracts on secondary markets.

The district court stated that it was "not address[ing] whether secondary market sales of XRP constitute offers and sales of investment contracts because

39

that question [was] not properly before the [c]ourt." SA23. But its reasoning—
that an investor needs to know that she is purchasing from the issuer or its affiliates
to expect profits based on the efforts of others—necessarily implicates secondary
market offers and sales because secondary market investors generally do not know
from whom they are purchasing. And the implications of the district court's
rulings are not limited to investment contracts in which the underlying asset is a
crypto asset. Other types of investment contracts—including master limited
partnership units—trade in secondary markets in registered transactions at volumes
reaching hundreds of billions of dollars. *See, e.g.*, *Fan v. StoneMor Partners LP*,
927 F.3d 710, 713 & n.1 (3d Cir. 2019); *SEC. v. Bergin*, No. 13-cv-1940, 2015 WL
4275509, at *1 (N.D. Tex. Jul. 15, 2015); Guy P. Lander, *U.S. Securities Law for
International Financial Transactions and Capital Markets* § 1:20 (2d ed. 2024
update); s*ee also Gary Plastic*, 756 F.2d at 232 (certificate of deposit-related
investment contracts traded on secondary market).

The district court's order declining to certify the summary judgment order
for interlocutory appeal similarly states that the summary judgment order "did not
hold that offers and sales on a digital asset exchange cannot create a reasonable
expectation of profits based on the efforts of others." JA__[DKT917at7]. But that
statement overlooks the reasoning of the summary judgment order, including its
determination that when the purchaser does not know the identity of the seller,

reasonable expectations of profits based on the efforts of others cannot be established "as a matter of law." SA27. And the order declining to certify interlocutory appeal again emphasized facts relevant to whether retail investors knew if they were purchasing from Ripple or its affiliates—an inquiry that (as discussed) is irrelevant under *Howey*. *See* JA__[DKT917at7-8].

### 3. The undisputed facts demonstrate that retail investors expected profits based on Ripple's efforts regardless of whether they knew that they were purchasing from Ripple or its affiliates.

When Ripple publicly represented that it would undertake efforts to increase the price of XRP, it was promising efforts to increase the price of all XRP, not only XRP knowingly purchased from Ripple or its affiliates.

Ripple's public marketing campaign involved hundreds of promotional statements published online and through other widely disseminated channels. *See supra* 10-16. There can be no dispute that Ripple's representations "reached individuals who purchased [XRP] on [crypto asset trading platforms]—and, indeed, motivated those purchases" whether or not they purchased from (or knew that they were purchasing from) Ripple or its affiliates. *Terraform*, 684 F. Supp. 3d at 198. In these circumstances, there is "little logic" to drawing a "distinction … between the reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market" because "[a]n investor selecting an investment opportunity in either setting is attracted by the promises

and offers made by issuers to the investing public." *Coinbase*, 726 F. Supp. 3d at 293. Because Ripple's representations "carry forward into the secondary market," "those representations may be considered." *Payward*, 2024 WL 4511499, at *11.

Moreover, the price of XRP, all units of which are fungible, does not depend on from whom it was purchased. *See* SA2 ("[E]ach unit of XRP … is fungible with any other unit."). That is, XRP purchased from Ripple or its affiliates has the same market price as XRP purchased from a third party.

Finally, retail investors bought millions of dollars of XRP on trading platforms *directly* from Ripple, Larsen, and Garlinghouse, and it would make little sense to exempt an issuer from the Securities Act registration requirements simply because retail investors also bought securities on trading platforms from other sellers. "The statutory policy of affording broad protection to investors is not to be thwarted by [such] irrelevant formulae." *Howey*, 328 U.S. at 301.

## C. The district court erred in distinguishing between what institutional investors and retail investors were led to expect.

In reaching different conclusions regarding the offers and sales of XRP to institutional investors and to retail investors, the district court distinguished between what it found to be the reasonable expectations of each group. But, as already discussed, both groups of investors received representations regarding Ripple's efforts to increase the price of XRP. In light of this public marketing campaign, both groups of investors were similarly situated, and there is no basis

42

for the district court's assumption that only institutional investors would have been led to expect profits from Ripple's efforts. Indeed, that distinction is contrary to *Howey*'s objective standard, which assesses what the issuer invites a reasonable investor to understand about the proffered investment. It also misunderstands the nature of Commission enforcement actions and misconstrues the facts on which the district court relied.

1. The district court reasoned that "[w]hereas [institutional investors] reasonably expected that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP, [retail investors] could not reasonably expect the same." SA23 (cleaned up). The district court speculated that "many" retail investors "may" have purchased XRP expecting profits based not on Ripple's efforts but on "other factors, such as general cryptocurrency market trends," "particularly because none of the [retail investors] were aware that they were buying XRP from Ripple." SA24.

Such speculation is contrary to the settled approach to "determining whether the offering is an investment contract," in which "courts are to examine the offering from an *objective* perspective." *Aqua-Sonic*, 687 F.2d at 584 (emphasis added); *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry … based on what the purchasers were led to expect.") (cleaned up); *see also Howey*, 328 U.S. at 300-01 (concluding that

43

investors were offered investment contracts even though some investors were not passive investors).[4] And, as discussed above (*see supra* 32-41), whether a reasonable investor expects to profit from an issuer's efforts does not turn on whether the investor knows that the seller is the issuer or its affiliate.

Moreover, to require the Commission to prove specific investors' motivation for investing and/or knowledge of the seller would be improper because "the Commission, unlike private parties, need not show reliance in its enforcement actions." *Lorenzo v. SEC*, 587 U.S. 71, 84 (2019); *see Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963) ("The Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury."). Indeed, the district court's focus on the seller's identity being known to investors appears rooted in inapplicable private liability concepts, whereas the basis of this

---

[4] That an offer or sale relates to crypto assets does not change the inquiry's objective nature. *See e.g.*, *Zakinov v. Ripple Labs, Inc*., No. 18-cv-06753, 2023 WL 4303644, at \*4-5 (N.D. Cal. June 30, 2023) ("Because the *Howey* test is an objective one … whether XRP is a security will be the same for all class members, regardless of each member's individual expectations … [and] plaintiff's status as a day trader will not affect the analysis"); *Audet*, 605 F. Supp. 3d at 398 n.7 ("Because the *Howey* test is an objective one … based upon what purchasers were led to expect … the subjective intent of individual plaintiffs in purchasing … is not determinative of the issue of whether … purchasers had a reasonable expectation of profit.") (cleaned up); *Telegram*, 448 F. Supp. 3d at 371 ("The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant.").

44

enforcement action is a failure to undertake the registration that should have occurred prior to offers and sales.

For the same reasons, the district court's assertion that some retail investors "were entirely unaware of Ripple's existence" is unavailing. SA24. To the contrary, it is undisputed that at times Ripple and the market treated "XRP" and "Ripple" as synonymous. *See supra* 15-16. As Garlinghouse himself explained, "market participants mistakenly conflated Ripple and XRP," and that conflation persisted even after Ripple tried to address it. JA__[DKT629 ¶ 917]. And even if certain retail investors were somehow unaware of Ripple's existence when they purchased XRP, that does not mean that those investors—much less the reasonable investor—were not led to expect profits based upon the efforts of Ripple's affiliates, agents, and promoters.

2. The district court reasoned that, unlike the offers and sales to institutional investors, those to retail investors "were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." SA24. But while "the existence of … lockups [may] tend to negate the likelihood that a reasonable … [p]urchaser purchased … for consumptive use," *Telegram*, 448 F. Supp. 3d at 373, the absence of such provisions from offers and sales to retail investors does not demonstrate that retail investors were not led to expect profits from Ripple's efforts. Such provisions are

45

generally absent from secondary-market transactions because "resale in the secondary market" is "crucial to the investor" for "realizing profits from capital appreciation." *Gary Plastic*, 756 F.2d at 240.

Moreover, Ripple touted the secondary market for XRP and its role in maintaining market liquidity. *See supra* 13, 15. That "promis[ing] assistance in the liquidation of [investors'] investments" shows that an investment was offered and sold with an expectation of profit. *Glen-Arden*, 493 F.2d at 1032, 1035; *see also Grybniak*, 2024 WL 4287222, at *11 (statements "regarding the possibility of resale in the secondary market are crucial to the investor with respect to the expectation of realizing profits from capital appreciation") (cleaned up).

3. The district court reasoned that two of Ripple's promotional materials—"Ripple Primer" and "Gateways"—"were widely circulated amongst potential [institutional] investors," "[b]ut[] there is no evidence that these documents were distributed more broadly to the general public." SA25. Yet those specific promotional materials are just two drops in the ocean that was Ripple's public marketing campaign, which included hundreds of representations on numerous widely-distributed channels. *See supra* 10-16.

Critically, courts treat all information reasonably available to investors as informing whether an expectation of profits exists. *See Joiner*, 320 U.S. at 353 (courts look to the "economic inducements held out" in promotional materials and

46

promoters' offerings are "judged as being what they were represented to be"); *see also supra* 29. There is no sound explanation for why the district court looked only to those two particular documents in assessing what Ripple was inviting investors to expect. In any event, Ripple repeated every relevant representation that appeared in Ripple Primer or Gateways on widely-distributed channels. *See supra* 8-9, 10-16.

4. The district court reasoned that there was not "evidence that [retail investors] understood that statements made by Larsen, Schwartz, Garlinghouse, and others were representations of Ripple and its efforts." SA25. As an initial matter, the Commission need not prove the understanding of any specific investor to demonstrate what an issuer led investors to expect (*see supra* 44-45) and courts look to all representations made to investors in conducting the expectation-of-profits analysis (*see supra* 46-47). Moreover, there is no reason to believe that retail investors would not understand such statements as Ripple's representations. Larsen was Ripple's co-founder, former CEO, and chairman; Garlinghouse, the self-described "face" of Ripple and its "most important spokesperson," was its CEO and frequently identified himself as such in his public statements; and Schwartz was Ripple's chief technology officer and a self-described "well known employee of the company." *See supra* 8, 10; JA__, __[DKT629 ¶¶ 23, 43]. And, in any event, the statements by those individuals were only a fraction of the public

47

representations concerning Ripple's promised efforts to generate profits for XRP investors. *See supra* 10-16.

5.  The district court reasoned—without citing any evidence—that whereas the institutional investors were "sophisticated entities," the retail investors were "generally less sophisticated as … investor[s]," and "[t]here is no evidence" that they could "parse through … multiple documents and statements," including "statements (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority) over an extended eight-year period." SA25.  But that Ripple's public marketing campaign was long, extensive, and varied is no reason to conclude that an investor could not grasp its essential message.  And that the marketing campaign was waged in large part on social media platforms and news sites makes it more, not less, accessible to "less sophisticated investors."  Moreover, the district court's unsupported assumption that retail investors would not "parse" Ripple's public statements is contrary to the fundamental premise of the federal securities laws' disclosure-based regime—that investors consume publicly-available information. *See Basic*, 485 U.S. at 246-49 & n. 29 (describing "impersonal" securities markets as "information-hungry").

Finally, the district court's logic turns the protective purpose of the Securities Act on its head.  Where investors are dispersed and relatively inexpert,

those features make it more, not less, likely that investors expect profits from someone else's efforts. *E.g.*, *Leonard*, 529 F.3d at 90 (investors "lacking in requisite expertise, so numerous, or so dispersed … bec[o]me utterly dependent on centralized management"). And "[t]he [Securities] Act does not speak in terms of 'sophisticated' as opposed to 'unsophisticated' people dealing in securities," and "[t]he rules when the giants play are the same as when the pygmies enter the market." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 526 (1974) (Douglas, J., dissenting); *see also United States v. Schlisser*, 168 F. App'x 483, 486 (2d Cir. 2006) (summary order) ("[T]he securities laws protect the gullible and unsophisticated as well as the experienced investor.") (cleaned up).

## II. The district court erred in concluding as a matter of law that there was no investment of money with respect to Ripple's offers and sales of XRP for non-cash consideration.

The district court's conclusion that there was no "investment of money" under *Howey* with respect to Ripple's offers and sales of XRP for non-cash consideration was likewise in error. Undisputed evidence demonstrates that the recipients provided tangible and definable consideration in return for Ripple's XRP. Ripple paid XRP to its employees for labor and to its business partners for developing new applications for XRP. *See supra* 18. On its own financial statements, Ripple valued that labor and services at more than $600 million. *See*

49

*supra* 17-18. Even though that consideration did not take the form of cash, it constitutes an "investment of money" under *Howey*.

The Supreme Court has recognized that an "investment of money" under *Howey* can include not only cash but also "goods and services" so long as the investor provides "some tangible and definable consideration." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 & n.12 (1979). Labor is a service that can constitute an investment of money under *Howey* where, as here, labor is provided in exchange as consideration. *See, e.g.*, *Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) ("[P]laintiffs contributed their legal right to a portion of their wages to [their employer] in return for the right … to participate in [the employer's] profit-sharing plan"); *see Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 437 (7th Cir. 1987) ("The securities acts apply to investment decisions, even those made indirectly or bound up with other decisions, such as employment or entrepreneurship."). It is likewise an "investment of money" under *Howey* when non-employee third parties provide computer programming or other "professional services" to a "developing, blockchain-based cryptocurrency platform" as consideration. *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 302 (Del. Super. Ct. 2022); *see also Frisch v. Likeopedia, LLC*, No. 23-

cv-3904, 2024 WL 3938345, at *5 (S.D.N.Y. Aug. 26, 2024) (consulting services for social media company).[5]

The district court erred when it concluded that "the record shows that recipients … did not pay money or some tangible and definable consideration to Ripple" because they did not provide "capital," "put up their money" or provide "cash." SA26 (cleaned up). That legal conclusion directly conflicts with the Supreme Court's determination that an "investment" under *Howey* does not need to "take the form of cash only, rather than of goods and services." *Daniel*, 439 U.S. at 560 n.12; *accord Uselton*, 940 F.2d at 574 ("[I]n spite of *Howey*'s reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract," and "the 'investment' may take the form of goods and services.") (cleaned up).

The district court's various reasons for erroneously requiring cash consideration—both in the summary judgment order and its order denying certification thereof—do not withstand scrutiny. The district court asserted that "the SEC did not identify or explain what tangible and definable employee labor

---

[5] The Supreme Court has accordingly determined that an issuer's offers and sales of its securities to its employees are not exempt from registration as "not involving any public offering." *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 122-27 (1953). Rather, registration is required for offers and sales made for "compensatory and incentive purposes." *Registration and Reporting Requirements for Employee Benefits Plans*, 55 Fed. Reg. 23909 (June 13, 1990); *see* 17 C.F.R. § 239.16b.

was provided in exchange for XRP." JA__[DKT917at9] (cleaned up). But the Commission identified employment agreements pursuant to which Ripple employees provided their labor in exchange for XRP. *See supra* 18. The district court similarly reasoned that "Ripple never received the payments" from the business partners to whom it distributed XRP. SA26; *see* JA__[DKT917at8]. But the Commission submitted evidence demonstrating that Ripple received—and recognized—millions of dollars in revenue from those business partners' efforts to develop new products for Ripple that used XRP. *See supra* 17-18; SA26 (noting this "consideration other than cash") (cleaned up). That Ripple "[did] not own the XRP Ledger" (JA__[DKT917at9]) is immaterial because Ripple nonetheless derived benefits from, and provided XRP as an incentive for, employees and business partners to increase the value of Ripple's XRP hoard.

Having erroneously required cash consideration for an "investment of money" under *Howey*, the district court then failed to appreciate that Ripple used those sales of XRP as a conduit—with the recipients serving as statutory underwriters—to unlawfully disperse XRP to the investing public without the protection of registration. *See* SA26-27; JA__[DKT917at9]. Transactions by an "issuer," its affiliates, or an "underwriter"—including "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security," 15 U.S.C. § 77b(a)(11)—that

involve a public offering must be registered. A public offering or distribution "comprises the entire process" by which a "block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (cleaned up), *amended on reh'g*, 377 F.2d 665 (2d Cir. 1967) (per curiam).

For those receiving XRP as consideration for labor or other services, the XRP did not come to rest with the initial recipients, but rather was dispersed through them as conduits with a view to being resold to the public. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466-68 (2d Cir. 1959). The public thus "need[ed] the protection of the [Securities] Act" disclosures. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953). The undisputed facts accordingly show that through offers and sales of XRP for non-cash consideration, Ripple was an issuer that unlawfully engaged in a public offering of unregistered XRP with its employees and business partners serving as underwriters. *See Telegram*, 448 F. Supp. 3d at 380-81.

Likewise, Ripple's offers and sales to institutional investors used those investors as underwriters to unlawfully distribute XRP to the public without registration. *See* SA22 (rejecting this argument without reasoning). Ripple's sales contracts made plain that institutional investors' purpose was to acquire XRP to resell it, including those contracts that priced XRP below its market price to build in an economic incentive for such resales. *See, e.g.*, JA__-__[DKT629 ¶¶ 789-

95]); *see also Telegram*, 448 F. Supp. 3d at 380 (issuer "built economic incentives into [sales,] including large discounts and differential lockups, to ensure that the [institutional purchasers] resold" to the "public at large"). Indeed, Ripple was aware that many of the institutional investors were reselling XRP into the public markets. *See, e.g.*, JA__-__, __-__, __-__[DKT629 ¶¶ 531-34, 567-74, 797, 799, 802-03]. This again demonstrates that the district court drew an erroneous distinction between Ripple's violative transactions with institutional investors and defendants' other unregistered offers and sales into the public markets.

* * *

For the reasons discussed above, Ripple offered and sold XRP as an investment contract, and therefore a security subject to the registration requirements of the federal securities laws. But Ripple never filed a registration statement or demonstrated an applicable exemption from the registration requirements. JA__[DKT629 ¶¶ 928-31]. As a result, defendants' offers and sales of XRP violated Section 5 of the Securities Act.

Ripple's failure to register its widespread offers and substantial sales of XRP also deprived XRP investors—especially retail investors—of the disclosures mandated by federal securities laws. Ripple thus denied investors and the market the benefit of those critical safeguards, including important information about not only the benefits but also the risks of investing in XRP. *See supra* 4-5.

54

## CONCLUSION

The district court erred in concluding that defendants' offers and sales of XRP to retail investors failed to satisfy *Howey*'s expectation-of-profits requirement. It also erred in concluding that Ripple's offers and sales of XRP in exchange for non-cash consideration failed to satisfy *Howey*'s investment-of-money requirement. The district court expressly did not address whether *Howey*'s other requirements were met with respect to those offers and sales. SA25, 27. But because the district court found *Howey*'s other requirements satisfied for Ripple's offers and sales of XRP to institutional investors, and defendants did not argue that those requirements would differ for offers and sales of XRP to retail investors or for offers and sales of XRP for which Ripple received non-cash consideration, this Court should order summary judgment for the Commission.

Accordingly, this Court should vacate the district court's final judgment, order summary judgment for the Commission with respect to defendants' offers and sales of XRP to retail investors and Ripple's offers and sales of XRP for which Ripple received non-cash consideration, and remand to the district court for further consideration of Larsen's and Garlinghouse's aiding and abetting of Ripple's Section 5 violations with respect to offers and sales to retail investors (*see supra* 21 n.1), and imposition of additional remedies (*see supra* 25 n.2).

Respectfully submitted,

TRACEY A. HARDIN
*Solicitor*

JORGE G. TENREIRO
*Chief Litigation Counsel*

HOPE H. AUGUSTINI
*Senior Litigation Counsel*

DAVID D. LISITZA
*Senior Appellate Counsel*

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-7724 (Hill)
hillez@sec.gov

January 15, 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of this Court's Rule 28.1.1(a) because it contains 12,212 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style, 14-point typeface.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: January 15, 2025

**24-2648(L)**
**24-2705(XAP)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

Plaintiff-Appellant-Cross-Appellee,

v.

RIPPLE LABS, INC.,

Defendant-Appellee-Cross-Appellant,

BRADLEY GARLINGHOUSE, CHRISTIAN A. LARSEN,

Defendants-Appellees,

JORDAN DEATON, JAMES LAMONTE, MYA LAMONTE, TYLER LAMONTE, MITCHELL MCKENNA, KRISTIANA WARNER, PHD ROSLYN LAYTON,

Intervenors.

---

On Appeal from a Final Order of the U.S. District Court
for the Southern District of New York, No. 20-cv-10832 (Torres, J.)

---

## SPECIAL APPENDIX

---

## TABLE OF CONTENTS

**Document**                                                                  **Page**

District Court Order Granting in Part and Denying in Part the SEC's
    Motion for Summary Judgment and Defendants' Motion for
    Summary Judgment, Dkt. No. 874 (July 13, 2023)............................SA-1

District Court Final Judgment, Dkt. No. 974 (Aug. 7, 2024)................SA-35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        -against-

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/13/2023__

20 Civ. 10832 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against

Defendants Ripple Labs, Inc. ("Ripple") and two of its senior leaders, Bradley Garlinghouse and

Christian A. Larsen, alleging that Defendants engaged in the unlawful offer and sale of securities

in violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a)

and (c). Am. Compl. ¶¶ 9, 430–35, ECF No. 46. The SEC also alleges that Garlinghouse and

Larsen aided and abetted Ripple's Section 5 violations. *Id.* ¶¶ 9, 436–40.

Before the Court are the parties' cross-motions for summary judgment. ECF Nos. 824,

836; *see also* ECF Nos. 621, 625, 639, 642.[1] For the reasons stated below, the SEC's motion is

GRANTED in part and DENIED in part, and Defendants' motion is GRANTED in part and

DENIED in part.

---

[1] Portions of the briefs, Rule 56.1 statements, and other documents discussed in this order were filed under seal or redacted. *See* ECF No. 819 (granting in part and denying in part the parties' and third parties' motions to seal). These materials are "judicial documents" because they are "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016). To the extent that information in these documents is disclosed in this order, the privacy and business interests that justified their sealing or redaction are outweighed by "the public's right of access to [information] necessary to understand the basis for court rulings." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).

BACKGROUND[2]

I.   <u>Factual Background</u>

    A.   Development of the XRP Ledger and the Founding of Ripple

In 2011 and early 2012, Arthur Britto, Jed McCaleb, and David Schwartz developed the source code for a cryptographically secured ledger, or a "blockchain,"[3] which is now known as the XRP Ledger.  SEC 56.1 Resp. ¶ 11, ECF No. 842; *see also* ECF No. 668.  They aimed to create a faster, cheaper, and more energy-efficient alternative to the bitcoin blockchain, the first blockchain ledger which was introduced in 2009.  *Id.* ¶¶ 4, 12.  When the XRP Ledger launched in 2012, its source code generated a fixed supply of 100 billion XRP.  *Id.* ¶¶ 17–18.  XRP is the native digital token of the XRP Ledger, and the XRP Ledger requires XRP to operate.  *Id.* ¶¶ 13–14.  Each unit of XRP is divisible into one million "drops," and each unit or drop of XRP is fungible with any other unit or drop.  Defs. 56.1 Resp. ¶¶ 17–18, ECF No. 835; *see also* ECF No. 663.

In 2012, Britto, Defendant Larsen, and McCaleb founded Ripple.[4]  *Id.* ¶ 41; SEC 56.1 Resp. ¶ 32.  Larsen became Ripple's CEO, a position he held until December 2016.  Defs. 56.1 Resp. ¶ 41.  Of the 100 billion XRP generated by the XRP Ledger's code, the three founders

---

[2] The facts in this section are taken from the parties' Rule 56.1 statements, counterstatements, and responses, unless otherwise noted.  Disputed facts are so noted.  Citations to a paragraph in a Rule 56.1 statement also include the opposing party's response.  "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted).

[3] A blockchain is an electronically distributed database or ledger "shared among a computer network's nodes."  *See* Adam Hayes, *Blockchain Facts: What Is It, How It Works, and How It Can Be Used*, Investopedia (updated Apr. 23, 2023), https://www.investopedia.com/terms/b/blockchain.asp/.  A blockchain is a system for recording information. Each transaction is recorded as a "block" of data on the digital ledger, which is connected to the blocks before and after it.  SEC 56.1 Resp. ¶ 1, ECF No. 842.  Blockchains are typically recorded across a distributed network of computers.  *Id.* ¶ 2.

[4] Ripple was originally named NewCoin, Inc. and incorporated under California law.  SEC 56.1 Resp. ¶ 33.  It was then renamed OpenCoin, Inc. in October 2012.  *Id.*  In 2013, the company was renamed Ripple Labs, Inc., and in 2014, it was incorporated under Delaware law.  *Id.*  In this order, the Court shall refer to the company as Ripple, even when referring to its forerunners, NewCoin and OpenCoin.

2

**SA-2**

retained 20 billion for themselves (including 9 billion for Larsen) and provided 80 billion XRP to Ripple. *Id.* ¶ 15; SEC 56.1 Resp. ¶ 21. The founders did not sell any XRP before the launch of the XRP Ledger, and Ripple never owned the 20 billion XRP retained by the three founders. SEC 56.1 Resp. ¶¶ 20, 22.

Since its founding, Ripple's mission has been to realize an "Internet of Value" by using technology to facilitate the transfer of value across the internet. *Id.* ¶ 35. Specifically, Ripple "seeks to modernize international payments by developing a global payments network for international currency transfers." *Id.* For instance, Ripple developed a software product called RippleNet, which allows customers to clear and settle cross-border financial transactions on mutually agreed upon terms. *Id.* ¶ 41. One feature of RippleNet is known as "on demand liquidity" ("ODL"). *Id.* ¶ 45. ODL facilitates cross-border transactions by allowing customers to exchange fiat currency (for example, U.S. dollars) for XRP and then the XRP for another fiat currency (for example, Mexican pesos). *Id.* ¶ 46; Defs. 56.1 Resp. ¶ 740.

Like ODL, some, but not all, of Ripple's products and services rely on the XRP Ledger and XRP. SEC 56.1 Resp. ¶ 44. The XRP Ledger is based on open-source software; anyone can use the ledger, submit transactions, host a node to contribute to the validation of transactions, propose changes to the source code, or develop applications that run on the ledger. *Id.* ¶¶ 52, 54. Other developers have built software products that use the XRP Ledger, such as payment-processing applications. *Id.* ¶ 59. Ripple has also funded companies as part of its "Xpring" initiative to incentivize the development of other use "cases" on the XRP Ledger. *Id.* ¶¶ 58–59.

**SA-3**

B.  Defendants' Sales and Distributions of XRP

At all times before the end of 2020, Ripple owned between 50 and 80 billion XRP.  *See*

Defs. 56.1 Resp. ¶¶ 15, 35; *see also id.* ¶ 256.  Although the parties dispute the specific dollar

amounts and details, they agree that from 2013 through the end of 2020, Ripple engaged in

various sales and distributions of XRP.  *See id.* ¶¶ 647, 716; *see generally* SEC 56.1 Resp.

¶¶ 92–123.

First, Ripple, through wholly owned subsidiaries, sold XRP directly to certain

counterparties (primarily institutional buyers, hedge funds, and ODL customers) pursuant to

written contracts (the "Institutional Sales").  SEC 56.1 Resp. ¶ 105; Defs. 56.1 Resp. ¶¶ 5–6,

619–20, 716.  The SEC alleges that Ripple sold approximately $728.9 million of XRP in these

Institutional Sales.  Defs. 56.1 Resp. ¶ 716.

Second, Ripple sold XRP on digital asset exchanges "programmatically," or through the

use of trading algorithms (the "Programmatic Sales").  SEC 56.1 Resp. ¶ 95; Defs. 56.1 Resp.

¶ 647.  Ripple's XRP sales on these digital asset exchanges were blind bid/ask transactions:

Ripple did not know who was buying the XRP, and the purchasers did not know who was selling

it.  SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54.  The SEC alleges that Ripple sold

approximately $757.6 million of XRP in Programmatic Sales.  Defs. 56.1 Resp. ¶ 647.  Ripple

used the proceeds from the Institutional and Programmatic Sales to fund its operations.  Defs.

56.1 Resp. ¶¶ 156–70.[5]

Ripple also distributed XRP as a form of payment for services ("Other Distributions").

Defs. 56.1 Resp. ¶¶ 827–30.  For instance, Ripple distributed XRP to its employees as a form of

---

[5] Since 2012, Ripple has also raised investment capital through multiple funding rounds in which it sold stock to investors.  SEC 56.1 Resp. ¶ 34.  Ripple has issued millions of shares of common stock, as well as convertible notes, preferred stock, and a stock warrant.  SEC Add. 56.1 Resp. ¶¶ 1607, 1609, ECF No. 844.

employee compensation.  SEC 56.1 Resp. ¶ 110; Defs. 56.1 Resp. ¶¶ 217–18.  Ripple also

distributed XRP in conjunction with its Xpring initiative to fund third parties that would develop

new applications for XRP and the XRP Ledger.  Defs. 56.1 Resp. ¶¶ 831–32.  In sum, the SEC

alleges that Ripple recognized revenue of $609 million from its distributions of XRP to

individuals and entities in exchange for services.  *Id.* ¶¶ 829–30.[6]

In addition to Ripple's sales and distributions, Larsen and Garlinghouse offered and sold

XRP in their individual capacities.  After stepping down as CEO of Ripple in December 2016,

Larsen became the Executive Chairman of Ripple's Board of Directors, a position he currently

holds.  SEC 56.1 Resp. ¶¶ 128–29.  From at least 2013 through 2020, Larsen sold XRP on digital

asset exchanges programmatically and made at least $450 million from his sales.  Defs. 56.1

Resp. ¶ 868.

Garlinghouse was hired as Ripple's COO in April 2015.  SEC 56.1 Resp. ¶ 140.  After

Larsen stepped down as CEO, Garlinghouse became CEO effective January 1, 2017, a position

he currently holds.  *Id.* ¶ 143.  From April 2017 through 2020, Garlinghouse sold XRP on digital

asset exchanges, *id.* ¶¶ 303, 310; the SEC alleges that Garlinghouse sold approximately $150

million in XRP during this period, Defs. 56.1 Resp. ¶ 870.  Garlinghouse has also received XRP

as part of his overall compensation from Ripple.  SEC 56.1 Resp. ¶ 145.

Defendants did not file a registration statement as to any offers or sales of XRP.  Defs.

56.1 Resp. ¶ 928.  Ripple did not publicly file any financial statements or other periodic reports,

---

[6] Ripple also distributed XRP for free to "early adopters and developers" and to charities and grant recipients.  SEC 56.1 Resp. ¶¶ 92–94.  The SEC does not include these transactions in its complaint.  *See* SEC Opp. at 26 n.15, ECF No. 841.

nor did it make any EDGAR filings[7] with the SEC for Ripple or XRP, such as a Form 10-Q,

Form 10-K, or Form 8-K relating to XRP.  *Id.* ¶¶ 930–32.

### C.  Defendants' XRP Marketing Campaign

The SEC alleges that "in 2013 Defendants began extensive, years-long marketing efforts

representing they would search for purported 'use' and 'value' for XRP—and casting XRP as an

opportunity to invest in those efforts."  SEC Opp. at 4, ECF No. 841.  The SEC points to a wide

range of statements, including informational brochures, internal talking points, public blog posts,

statements on social media, videos, interviews with various Ripple employees, and more.

Defendants dispute the SEC's factual narrative and argue that the SEC "cherry-picks excerpts

from documents with many authors and from public statements of many speakers, made at many

points across an eight-year period of time to many audiences."  Defs. Opp. at 10, ECF No. 828.[8]

Since at least 2013, Ripple has prepared and distributed documents that describe the

company's operations, the XRP trading market, and the XRP Ledger.  For example, in 2013 and

2014, Ripple created three brochures: a "Ripple for Gateways" brochure, a "Ripple Primer," and

a "Deep Dive for Finance Professionals."  Defs. 56.1 Resp. ¶¶ 59–60, 171.  These documents

were distributed publicly to prospective and existing XRP investors and outline, among other

things, the relationship between XRP and Ripple's business model.  *Id.*  Ripple circulated

versions of the "Gateways" brochure to more than one hundred third parties, *id.* ¶ 172; the

"Primer" had "widespread distribution," *id.* ¶ 178; and the "Deep Dive" was posted on Ripple's

website and sent to over one hundred people, *id.* ¶¶ 185–86.  Later, starting at the end of 2016,

---

[7] EDGAR, or "Electronic Data Gathering, Analysis, and Retrieval," is an electronic filing system developed by the SEC "to increase the efficiency and accessibility of corporate filings."  James Chen, *Electronic Data Gathering Analysis and Retrieval: Overview, FAQ*, Investopedia (updated Feb. 13, 2022), https://www.investopedia.com/terms/e/edgar.asp/.

[8] The SEC's Rule 56.1 statement contains over 1,600 purported facts—many of which are disputed by Defendants—and cites over 900 exhibits.  *See generally* Defs. 56.1 Resp.  The Court highlights below only those documents and statements directly relevant to this order.

Ripple began to publish on its website quarterly "XRP Market Reports," which were intended to provide "clarity and visibility" about Ripple's market activities. *Id.* ¶¶ 500–01.

Ripple and its senior leaders used a variety of social media platforms—including Twitter, Facebook, Reddit, and XRP Chat, an online forum described as "The Largest XRP Crypto Community Forum"—to communicate about XRP and Ripple. Defs. 56.1 Resp. ¶¶ 77, 192; *see, e.g.*, *id.* ¶¶ 391–96, 401–08, 425, 437–40. Ripple officials also spoke in interviews about the company and its relationship to XRP. For instance, Larsen gave interviews in which he discussed XRP, *e.g.*, *id.* ¶¶ 371, 377, and Garlinghouse was interviewed by media outlets such as the Financial Times, Bloomberg, and CNBC, spoke with organizations like the Economic Club of New York, and participated at conferences such as DC Fintech, in which he described Ripple's operations and the XRP market, *e.g.*, *id.* ¶¶ 252, 263, 269, 387, 444, 446.

### D. Defendants' Receipt of Legal Advice About XRP Offers and Sales

In February 2012, before the XRP Ledger was publicly launched, Ripple's founders, including Larsen, received from the Perkins Coie LLP law firm a memorandum, which sought to "review the proposed product and business structure, analyze the legal risks associated with [Ripple], and recommend steps to mitigate these risks." Defs. 56.1 Resp. ¶ 986; *see* ECF No. 846-29 at 4. The memorandum analyzes, among other things, the legal risks associated with selling XRP. Defs. 56.1 Resp. ¶ 986. Specifically, it states that "[i]f sold to [i]nvestors, [XRP tokens] are likely to be securities," and "[t]o the extent that [the founders'] issuance of [XRP] does not involve an investment of money, there is a low risk that [XRP] will be considered an investment contract." *Id.* ¶¶ 986, 989; *see* ECF No. 846-29 at 5, 12.

In October 2012, Ripple, Larsen, and others received another memorandum from Perkins Coie which sought to "review the proposed features of the Ripple [n]etwork and [XRP] and to

provide recommendations for mitigating relevant legal risks."  Defs. 56.1 Resp. ¶ 987; *see* ECF No. 846-30 at 3.  That memorandum states that "[a]lthough we believe that a compelling argument can be made that [XRP tokens] do not constitute 'securities' under federal securities laws, given the lack of applicable case law, we believe that there is some risk, albeit small, that the [SEC] disagrees with our analysis."  Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6.  The memorandum further states that, "[t]he more that [the founders and Ripple] promote [XRP] as an investment opportunity, the more likely it is that the SEC will take action and argue that [XRP tokens] are 'investment contracts.'"  Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6.

Larsen reviewed both the February and the October 2012 memoranda and discussed them with Perkins Coie attorneys.  Defs. 56.1 Resp. ¶ 998.  Both memoranda analyze XRP under the Supreme Court's holding in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), which outlines the standard for an investment contract.  *Id.* ¶ 988.

## II.   Procedural Background

On December 22, 2020, the SEC commenced this action.  ECF No. 1.  An amended complaint was filed on February 18, 2021.  Am. Compl.  Fact discovery closed on August 31, 2021, *see* ECF No. 313, and expert discovery concluded on February 28, 2022, *see* ECF No. 411.  On March 11, 2022, the Court denied the SEC's motion to strike Ripple's affirmative defense that it "lacked . . . 'notice that its conduct was in violation of law, in contravention of Ripple's due process rights,'" ECF No. 128.  ECF No. 440.  That same day, the Court also denied Garlinghouse's and Larsen's separate motions to dismiss, ECF Nos. 105, 110.  MTD Order, ECF No. 441.  On March 6, 2023, the Court granted in part and denied in part the parties' motions to preclude expert testimony.  ECF No. 814.

Before the Court are the parties' cross-motions for summary judgment filed on September 13, 2022.  ECF Nos. 621, 625; *see also* ECF Nos. 639, 642, 824, 836.  The Court has also reviewed amicus briefs from Accredify, Inc. d/b/a/ InvestReady, ECF No. 698[9]; the Blockchain Association, ECF No. 706; the Chamber of Digital Commerce, ECF No. 649; Coinbase, Inc., ECF No. 705; Cryptillian Payment Systems, LLC, ECF No. 716; the Crypto Council for Innovation, ECF No. 711; I-Remit, Inc., ECF No. 660; the New Sports Economy Institute, ECF No. 717; Paradigm Operations LP, ECF No. 707; Phillip Goldstein and the Investor Choice Advocates Network, ECF No. 683; Reaper Financial, LLC, ECF No. 710; SpendTheBits, Inc., ECF No. 684; TapJets, Inc., ECF No. 661; Valhil Capital, LLC, ECF No. 722; Veri DAO, LLC, ECF No. 709; and XRP holders Jordan Deaton, James LaMonte, Mya LaMonte, Tyler LaMonte, Mitchell McKenna, and Kristiana Warner, ECF No. 708.[10]

## DISCUSSION

I.  Legal Standard

A.  Summary Judgment

Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

---

[9] Accredify, Inc. did not formally file an amicus brief after the Court granted leave to do so, *see* ECF No. 704, but included its brief as an attachment to its original request, *see* ECF No. 698.

[10] On November 4, 2022, the Court directed that any requests to file amicus briefs be filed by November 11, 2022. ECF No. 695.  William M. Cunningham and Anoop Bungay, both *pro se* litigants, each separately requested leave to file an amicus brief on November 16, 2022, and January 20, 2023, respectively.  ECF Nos. 712, 807.  Cunningham's and Bungay's requests are DENIED as untimely.

The moving party initially bears the burden of demonstrating the absence of a genuine dispute of material fact by citing evidence in the record. *See Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 165 (2d Cir. 2002). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

### B. Section 5 Liability and the *Howey* Test

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c), (e). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

Defendants do not dispute that they offered to sell and sold XRP through interstate commerce. *See, e.g.*, Defs 56.1 Resp. ¶¶ 647, 716, 868, 870. They also do not dispute that they did not file a registration statement with the SEC for any offer or sale of XRP. *Id.* ¶ 928. The question before the Court is whether Defendants offered to sell or sold XRP as a security. Specifically, the SEC alleges that Defendants sold XRP as an "investment contract," which is a type of security as defined by the Securities Act, 15 U.S.C. § 77b(a)(1). *See, e.g.*, SEC Mem. at

2, 5, 49, ECF No. 837; Am. Compl. ¶¶ 3, 9, 60.  Defendants argue that they did not sell XRP as

an investment contract, and, therefore, no registration statement was required.  *See, e.g.*, Defs.

Mem. at 3, 36, ECF No. 825; Defs. 56.1 Resp. ¶ 928.

In *SEC v. W.J. Howey Co.*, the Supreme Court held that under the Securities Act, an

investment contract is "a contract, transaction[,] or scheme whereby a person [(1)] invests his

money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of

the promoter or a third party."  328 U.S. at 298–99; *see also SEC v. Edwards*, 540 U.S. 389, 393

(2004).  In analyzing whether a contract, transaction, or scheme is an investment contract, "form

should be disregarded for substance and the emphasis should be on economic reality" and the

"totality of circumstances."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Glen-Arden*

*Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974).

C.  Defendants' "Essential Ingredients" Test

In their summary judgment briefing, Defendants advance a novel "essential ingredients"

test, arguing that, in addition to the *Howey* test, all investment contracts must contain three

"essential ingredients": (1) "a contract between a promoter and an investor that establishe[s] the

investor's rights as to an investment," which contract (2) "impose[s] post-sale obligations on the

promoter to take specific actions for the investor's benefit" and (3) "grant[s] the investor a right

to share in profits from the promoter's efforts to generate a return on the use of investor funds."

Defs. Mem. at 2; *see id.* at 13–28.

The Court declines to adopt Defendants' "essential ingredients" test, which would call for

the Court to read beyond the plain words of *Howey* and impose additional requirements not

mandated by the Supreme Court.  The Court sees no reason to do so.  Neither *Howey*, nor its

progeny, hold that an investment contract requires the existence of Defendants' "essential

11

**SA-11**

ingredients." To the contrary, these cases make clear that the relevant test reflects a focus on an investor's expectation of "profits . . . from the efforts of others," rather than the formal imposition of post-sale obligations on the promoter or the grant to an investor of a right to share in profits. *Howey*, 328 U.S. at 301. The Supreme Court's use of the word "profits" in *Howey* was intended to refer to "income or return," *Edwards*, 540 U.S. at 394, and financial returns on investments are not equivalent to post-sale obligations or profit sharing. Thus, the Court is not persuaded that precedent supports the consideration of these "ingredients" in determining whether a contract, transaction, or scheme constitutes an investment contract under *Howey*.

Defendants do not cite a single case that has applied their test. *See generally* Defs. Mem. at 13–28. Rather, Defendants contend that the Court should look to the pre-1933 state "blue sky" law cases on which the *Howey* Court relied. *Id.* at 16–17. According to Defendants, every pre-1933 blue sky investment contract case involved a contract, post-sale obligations on the promoter, and the investor's right to receive a profit. *Id.* at 18–21. That may be so, but the *Howey* Court relied on the state courts' definition of an investment contract as "a contract or scheme for the placing of capital or laying out of money in a way intended to secure income or profit from its employment" when fashioning the relevant test. 328 U.S. at 298 (quotation marks and citation omitted). Had the Supreme Court intended to incorporate these ingredients as essential requirements, it would have done so. In any event, even accepting Defendants' survey and analysis of the caselaw as accurate, the fact that pre-1933 investment contract cases shared some common features does not convert those common features into requirements necessary for finding an investment contract under *Howey*. Rather, the Supreme Court was guided by the "fundamental purpose undergirding the Securities Acts," in which Congress "painted with a

broad brush" in recognition of the "virtually limitless scope of human ingenuity." *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990).  So, too, must this Court be guided.

Indeed, in the more than seventy-five years of securities law jurisprudence after *Howey*, courts have found the existence of an investment contract even in the absence of Defendants' "essential ingredients," including in recent digital asset cases in this District.  *See, e.g.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 175–80 (S.D.N.Y. 2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction . . . . However, such a formalized profit-sharing mechanism is not required.").  And this makes sense, given that the *Howey* test was intended to "embod[y] a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  Put differently, the *Howey* test was intended to effectuate "[t]he statutory policy of affording broad protection to investors," protection that is "not to be thwarted by unrealistic and irrelevant formulae."  *Id.* at 301.  Accordingly, the Court rejects Defendants' argument that all investment contracts must include post-sale obligations on the promoter and grant the investor a right to share in profits from the promoter's efforts.

The Court does not reach Defendants' first "essential ingredient": that a contract must exist for an investment contract to exist.[11]  As discussed in greater detail below, in each instance where Defendants offered or sold XRP as an investment contract, a contract existed.

---

[11] The SEC's opposition papers misconstrue Defendants' "essential ingredients" test.  The SEC dedicates several pages to refuting the argument that a *written* contract must exist, *see* SEC Opp. at 19–24, but Defendants' proposed test does not turn on the need for a written contract as opposed to an oral or implied contract, *see* Defs. Mem. at 2, 18–19; Defs. Reply at 9, ECF No. 832.  Therefore, the Court does not address the SEC's arguments that *Howey* does not require the existence of a written contract.  *See* SEC Opp. at 19–24.

13

**SA-13**

II.    Analysis

    A.  The XRP Token

The plain words of *Howey* make clear that "an investment contract for purposes of the

Securities Act means a *contract, transaction*[,] *or scheme*." 328 U.S. at 298–99 (emphasis

added).  But the subject of a contract, transaction, or scheme is not necessarily a security on its

face.  Under *Howey*, the Court analyzes the economic reality and totality of circumstances

surrounding the offers and sales of the underlying asset.  *See Tcherepnin*, 389 U.S. at 336;

*Glen-Arden*, 493 F.2d at 1034.

    *Howey* and its progeny have held that a variety of tangible and intangible assets can serve

as the subject of an investment contract.  *See, e.g.*, *Howey*, 328 U.S. 293 (orange groves);

*Glen-Arden*, 493 F.2d 1027 (whiskey casks); *Edwards*, 540 U.S. 389 (payphones); *Hocking v.*

*Dubois*, 885 F.2d 1449 (9th Cir. 1989) (condominiums), *cert. denied*, 494 U.S. 1078 (1990);

*Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) (beavers); *SEC v. Telegram Grp. Inc.*,

448 F. Supp. 3d 352 (S.D.N.Y. 2020) (digital tokens).  In each of these cases, the subject of the

investment contract was a standalone commodity, which was not itself inherently an investment

contract.  For instance, if the original citrus groves in *Howey* were later resold, those resales may

or may not constitute investment contracts, depending on the totality of circumstances

surrounding the later transaction.

    Here, Defendants argue that XRP does not have the "character in commerce" of a

security and is akin to other "ordinary assets" like gold, silver, and sugar.  *See* Defs. Mem. at

3–4, 42–44 (citation omitted).  This argument misses the point because ordinary assets—like

gold, silver, and sugar—may be sold as investment contracts, depending on the circumstances of

those sales.  *See Glen-Arden*, 493 F.2d at 1033, 1035; *Fedance v. Harris*, 1 F.4th 1278, 1288–89

(11th Cir. 2021) ("Plenty of items that can be consumed or used . . . have been the subject of

transactions determined to be securities because they had the attributes of an investment."

(citation omitted)).  Even if XRP exhibits certain characteristics of a commodity or a currency, it

may nonetheless be offered or sold as an investment contract.

As another court in this District recently held:

> While helpful as a shorthand reference, the security in this case is not simply the
> [digital token, the] Gram, which is little more than alphanumeric cryptographic
> sequence . . . . This case presents a "scheme" to be evaluated under *Howey* that
> consists of the full set of contracts, expectations, and understandings centered on
> the sales and distribution of the Gram.  *Howey* requires an examination of the
> entirety of the parties' understandings and expectations.

*Telegram*, 448 F. Supp. 3d at 379.  XRP, as a digital token, is not in and of itself a "contract,

transaction[,] or scheme" that embodies the *Howey* requirements of an investment contract.

Rather, the Court examines the totality of circumstances surrounding Defendants' different

transactions and schemes involving the sale and distribution of XRP.  *See Marine Bank v.

Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on

the basis of the content of the instruments in question, the purposes intended to be served, and

the factual setting as a whole.").

B.  Defendants' Offers and Sales of XRP

The parties cross-move for summary judgment on the SEC's claim under Section 5 of the

Securities Act.  Whether Defendants offered or sold "investment contracts" is a legal question

that the Court resolves based on the undisputed record.  *See SEC v. Thompson*, 732 F.3d 1151,

1160–61 (10th Cir. 2013) (collecting cases).  The SEC alleges that Ripple engaged in three

categories of unregistered XRP offers and sales:

(1) Institutional Sales under written contracts for which it received $728 million;
(2) Programmatic Sales on digital asset exchanges for which it received $757
million; and

(3) Other Distributions under written contracts for which it recorded $609 million in "consideration other than cash."

*See* SEC Reply at 4–5, ECF No. 843. The SEC also alleges that Larsen and Garlinghouse engaged in unregistered individual XRP sales, from which they received at least $450 million and $150 million, respectively. *See id.* at 5. The Court shall separately analyze and evaluate each category of transaction. *See Marine Bank*, 455 U.S. at 560 n.11.

### 1. Institutional Sales

The Court first addresses Ripple's Institutional Sales of XRP to sophisticated individuals and entities (the "Institutional Buyers") pursuant to written contracts. *See* SEC Mem. at 28–31; Defs. Mem. at 11. The SEC alleges that these Institutional Sales were distributions of XRP into public markets through conduits, and that "some Institutional [Buyers] were buying XRP as brokers, while others simply resold it as part of their trading strategies." SEC Mem. at 28–29.

The first prong of *Howey* examines whether an "investment of money" was part of the relevant transaction. 328 U.S. at 301. Here, the Institutional Buyers invested money by providing fiat or other currency in exchange for XRP. Defs. 56.1 Resp. ¶ 607. Defendants do not dispute that Ripple received money for XRP through its Institutional Sales. *See* Defs. Mem. at 11; Defs. Opp. at 17 n.7. However, Defendants argue that an "investment of money" is different from "merely payment of money"—that is, *Howey* requires not just payment of money but an intent to invest that money. *See* Defs. Opp. at 18–19.

Not so. Defendants' purported distinction is not supported by caselaw. The proper inquiry is whether the Institutional Buyers "provide[d] the capital," *Howey*, 328 U.S. at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d]" cash, *Telegram*, 448 F. Supp. 3d at 368–69. Defendants do not dispute that there was a payment of money; the Court finds, therefore, that this element has been established.

16

The second prong of *Howey*, the existence of a "common enterprise," 328 U.S. at 301,

may be demonstrated through a showing of "horizontal commonality," *Revak v. SEC Realty

Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  Horizontal commonality exists where the investors' assets

are pooled and the fortunes of each investor are tied to the fortunes of other investors, as well as

to the success of the overall enterprise.  *See id.* at 88; *see also SEC v. SG Ltd.*, 265 F.3d 42, 49

(1st Cir. 2001) ("[H]orizontal commonality [is] a type of commonality that involves the pooling

of assets from multiple investors so that all share in the profits and risks of the enterprise.");

*ATBCOIN LLC*, 380 F. Supp. 3d at 353.[12]

Here, the undisputed record shows the existence of horizontal commonality.  Ripple

pooled the proceeds of its Institutional Sales into a network of bank accounts under the names of

its various subsidiaries.  *See, e.g.*, ECF No. 831-29 ¶¶ 3–4; Defs. 56.1 Resp. ¶¶ 795–98; *see also

id.* ¶ 1004.  Although Ripple maintained separate bank accounts for each subsidiary, Ripple

controlled all of the accounts and used the funds raised from the Institutional Sales to finance its

operations.  *See* Defs. 56.1 Resp. ¶¶ 255–56; SEC Reply at 8; *cf.* Defs. Opp. at 22–23; Defs.

Reply at 19–20, ECF No. 832.  Defendants do not dispute that Ripple did not "segregate[] and

separately manage[]" investor funds or "allow[] for profits to remain independent."  *Kik*, 492 F.

Supp. 3d at 179; *see* SEC Reply at 8.  And, Ripple's accountants recorded all of its XRP-related

proceeds together.  *See* Defs. 56.1 Resp. ¶¶ 147–48.

Further, each Institutional Buyer's ability to profit was tied to Ripple's fortunes and the

fortunes of other Institutional Buyers because all Institutional Buyers received the same fungible

---

[12] The SEC also argues that the record establishes strict vertical commonality.  *See* SEC Mem. at 51–53.  The
Second Circuit has not addressed whether the strict vertical commonality theory can give rise to a common
enterprise.  *See Revak*, 18 F.3d at 88.  In this case, because horizontal commonality establishes the existence of a
common enterprise, the Court does not reach the issue of strict vertical commonality or its viability as a theory.

XRP.[13]  *See id.* ¶¶ 206–07.  Ripple used the funds it received from its Institutional Sales to promote and increase the value of XRP by developing uses for XRP and protecting the XRP trading market.  *See id.* ¶¶ 156–57, 161–68, 255–56.  When the value of XRP rose, all Institutional Buyers profited in proportion to their XRP holdings.  *See Kik*, 492 F. Supp. 3d at 178 ("The success of the ecosystem drove demand for [the digital token] Kin and thus dictated investors' profits."); *Telegram*, 448 F. Supp. 3d at 369–70 (finding horizontal commonality where the digital token purchasers "possess an identical instrument, the value of which is entirely dependent on the success or failure of the TON Blockchain" and "[t]he investors' fortunes are directly tied to the success of the TON Blockchain as a whole").  The Court finds the existence of a common enterprise because the record demonstrates that there was a pooling of assets and that the fortunes of the Institutional Buyers were tied to the success of the enterprise as well as to the success of other Institutional Buyers.

The third prong of *Howey* examines whether the economic reality surrounding Ripple's Institutional Sales led the Institutional Buyers to have "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).[14]  In this context, profit means an "income or return, to include, for example, dividends, other periodic payments, or *the increased value of the investment*."  *Edwards*, 540 U.S. at 394 (emphasis added).  The reasonable expectation of profits from the efforts of others need not be the sole reason a purchaser buys an investment; an asset

---

[13] The Court holds only that a common enterprise existed between Ripple and the Institutional Buyers.  The Court does not reach the question of whether the common enterprise extends to encompass "other XRP holders," Defendants Garlinghouse and Larsen, the "XRP ecosystem," or any other entities.  *Cf.* Defs. Opp. at 20–21.
[14] *Howey* contemplates that an investor is "led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–99.  However, the Second Circuit "ha[s] held that the word 'solely' should not be construed as a literal limitation; rather, [courts] 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'"  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)).

may be sold for both consumptive and speculative uses. *See SEC v. LBRY, Inc.*, No. 21 Civ. 260, 2022 WL 16744741, at *7 (D.N.H. Nov. 7, 2022). Moreover, "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371 (citing *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)).

Based on the totality of circumstances, the Court finds that reasonable investors, situated in the position of the Institutional Buyers, would have purchased XRP with the expectation that they would derive profits from Ripple's efforts. From Ripple's communications, marketing campaign, and the nature of the Institutional Sales, reasonable investors would understand that Ripple would use the capital received from its Institutional Sales to improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP. *Cf. Kik*, 492 F. Supp. 3d at 179–80; *Telegram*, 448 F. Supp. 3d at 371–78.

Starting in 2013, Ripple marketed XRP to potential investors, including the Institutional Buyers, by distributing promotional brochures that touted XRP as an investment tied to the company's success. For instance, in the "Deep Dive" brochure, which was circulated to prospective investors, Ripple explains that its "business model is predicated on a belief that demand for XRP will increase . . . if the Ripple protocol becomes widely adopted," and "[i]f the Ripple protocol becomes the backbone of global value transfer, Ripple . . . expects the demand for XRP to be considerable." Defs. 56.1 Resp. ¶ 187; ECF No. 855-14 at 23, 29, 31. Similarly, the "Ripple Primer" states that Ripple "hopes to make money from XRP if the world finds the Ripple network useful." Defs. 56.1 Resp. ¶ 180; ECF No. 861-26 at 20. The "Gateways" brochure also explains that "Ripple's business model is based on the success of [XRP,]" and includes a graphical representation of bitcoin's price change below the text: "Can a virtual

currency really create and hold value? *Bitcoin proves it can*." Defs. 56.1 Resp. ¶¶ 173, 175;
ECF No. 861-25 at 21.

Later, through its XRP Market Reports, Ripple continued to connect XRP's price and
trading to its own efforts. Ripple's Q1 2017 XRP Markets Report states that the company's
efforts—including its "vocal . . . commitment to XRP," the announcement of a new business
relationship, and "continu[ing] to sign up banks to commercially deploy its enterprise blockchain
solution and join its global payments network"—may have had an impact on XRP's price
increase and "impressive" trading volume. Defs. 56.1 Resp. ¶ 421; ECF No. 839-4 at 9. The Q2
2017 XRP Markets Report highlights XRP's "dramatic" and "stunning" price increase and notes
that "[t]he market responded favorably to [Ripple's] escrow and decentralization
announcements." Defs. 56.1 Resp. ¶ 422; ECF No. 839-4 at 16. Similarly, Ripple's Q1 2020
XRP Markets Report states that XRP's liquidity was "bolstered through new use cases for XRP
outside of cross-border payments." Defs. 56.1 Resp. ¶ 366; ECF No. 839-4 at 98.

During this time, Ripple's senior leaders echoed similar statements on various public
channels. In a February 2014 interview, Larsen said, "for Ripple . . . to do well, we have to do a
very good job in protecting the value of XRP and the value of the network," and asked potential
investors to "[g]ive [Ripple] time" to "add[] the most value to the protocol." Defs. 56.1 Resp.
¶ 461. In July 2017, David Schwartz, who was then chief cryptographer at Ripple, *see id.* ¶ 40,
wrote on Reddit that "Ripple's interest[s] closely (but, yes, not perfectly) align with those of
other XRP holders," *id.* ¶ 462. In February 2018, Schwartz posted on Reddit that what "really
set[s] XRP apart from any other digital asset" is the "amazing team of dedicated professionals
that Ripple has managed to amass to develop an ecosystem around XRP." *Id.* ¶¶ 345, 349, 360.
In a December 2017 interview, Garlinghouse stated that XRP gave Ripple "a huge strategic asset

to go invest in and accelerate the vision [it] see[s] for an internet of value." *Id.* ¶ 468. And, in March 2018, Garlinghouse said at a press conference that "Ripple is very, very interested in the success and the health of the ecosystem and will continue to invest in the ecosystem." *Id.* ¶ 469.

Ripple and its senior leaders publicly emphasized the complexity of creating an "internet of value" and the need for extensive capital to solve this "trillion dollar" problem. Defs. 56.1 Resp. ¶ 101. For instance, in October 2017, Garlinghouse declared in a YouTube video: "I have no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP because we're solving a multitrillion dollar problem." *Id.* ¶ 98; *see also id.* ¶¶ 99–101. In July 2017, Schwartz wrote on Reddit that, "Ripple can justify spending $100 million on a project if it could reasonably be expected to increase the price of XRP by one penny over the long term." *Id.* ¶ 462. In November 2017, Schwartz posted on XRP Chat that Ripple would use its "war chest" to put upward pressure on XRP's price. *Id.* ¶ 445.

These statements, and many more, are representative of Ripple's overall messaging to the Institutional Buyers about the investment potential of XRP and its relationship to Defendants' efforts. Clearly, the Institutional Buyers would have understood that Ripple was pitching a speculative value proposition for XRP with potential profits to be derived from Ripple's entrepreneurial and managerial efforts. *See LBRY*, 2022 WL 16744741, at *5–6.

Further, the nature of the Institutional Sales also supports the conclusion that Ripple sold XRP as an investment rather than for consumptive use. In their sales contracts, some Institutional Buyers agreed to lockup provisions or resale restrictions based on XRP's trading volume. *See, e.g.*, Defs. 56.1 Resp. ¶¶ 575, 800–01. These restrictions are inconsistent with the notion that XRP was used as a currency or for some other consumptive use. "Simply put, a

rational economic actor would not agree to freeze millions of dollars . . . if the purchaser's intent was to obtain a substitute for fiat currency." *Telegram*, 448 F. Supp. 3d at 373.  Certain Institutional Sales contracts required the Institutional Buyer to indemnify Ripple for claims arising out of the sale or distribution of XRP, *see* Defs. 56.1 Resp. ¶ 792, and other contracts expressly stated that the Institutional Buyer was purchasing XRP "solely to resell or otherwise distribute . . . and not to use [XRP] as an [e]nd [u]ser or for any other purpose." *Id.* ¶ 793.  These various provisions in the Institutional Sales contracts support the conclusion that the parties did not view the XRP sale as a sale of a commodity or a currency—they understood the sale of XRP to be an investment in Ripple's efforts.

Therefore, having considered the economic reality and totality of circumstances surrounding the Institutional Sales, the Court concludes that Ripple's Institutional Sales of XRP constituted the unregistered offer and sale of investment contracts in violation of Section 5 of the Securities Act.[15]

## 2.  Programmatic Sales

The Court next addresses Ripple's Programmatic Sales, which occurred under different circumstances from the Institutional Sales.  *See* SEC Mem. at 28; Defs. Mem. at 10–11.  The SEC alleges that in the Programmatic Sales to public buyers ("Programmatic Buyers") on digital asset exchanges, "Ripple understood that people were speculating on XRP as an investment," "explicitly targeted speculators[,] and made increased speculative volume a 'target goal.'"  SEC Mem. at 28.

---

[15] The Court holds only that Ripple's sales of XRP to the Institutional Buyers were offers and sales of investment contracts.  To the extent the SEC instead argues that Ripple actually sold investment contracts to the public and used the Institutional Buyers as underwriters, the Court rejects that argument.  *Cf.* SEC Mem. at 63–65.

Having considered the economic reality of the Programmatic Sales, the Court concludes that the undisputed record does not establish the third *Howey* prong.  Whereas the Institutional Buyers reasonably expected that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP, *see Kik*, 492 F. Supp. 3d at 180; *cf. supra* § II.B.1, Programmatic Buyers could not reasonably expect the same.  Indeed, Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple, or any other seller of XRP.  SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54.  Since 2017, Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume.  SEC 56.1 Resp. ¶¶ 77, 82.  Therefore, the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all.  An Institutional Buyer knowingly purchased XRP directly from Ripple pursuant to a contract, but the economic reality is that a Programmatic Buyer stood in the same shoes as a secondary market purchaser who did not know to whom or what it was paying its money.[16]

Further, it is not enough for the SEC to argue that Ripple "explicitly targeted speculators" or that "Ripple understood that people were speculating on XRP as an investment," SEC Mem. at 28, because a speculative motive "on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the [Securities Act]," *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966).  "[A]nyone who buys or sells[, for example,] a horse or an automobile hopes to realize a

---

[16] The Court does not address whether secondary market sales of XRP constitute offers and sales of investment contracts because that question is not properly before the Court.  Whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme.  *See Marine Bank*, 455 U.S. at 560 n.11; *Telegram*, 448 F. Supp. 3d at 379; *see also* ECF No. 105 at 34:14-16, *LBRY*, No. 21 Civ. 260 (D.N.H. Jan. 30, 2023) (declining to extend holding to include secondary sales).

profitable 'investment.' But the expected return is not contingent upon the continuing efforts of another." *Id.* (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943)). The relevant inquiry is whether this speculative motive "derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852. It may certainly be the case that many Programmatic Buyers purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)—particularly because none of the Programmatic Buyers were aware that they were buying XRP from Ripple.

Of course, some Programmatic Buyers may have purchased XRP with the expectation of profits to be derived from Ripple's efforts. However, "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371 (citation omitted). Here, the record establishes that with respect to Programmatic Sales, Ripple did not make any promises or offers because Ripple did not know who was buying the XRP, and the purchasers did not know who was selling it. SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54. In fact, many Programmatic Buyers were entirely unaware of Ripple's existence. SEC Add. 56.1 Resp. ¶ 1606, ECF No. 844; ECF Nos. 831-1–831-26.

The Programmatic Sales also lacked other factors present in the economic reality of the Institutional Sales which cut in favor of finding "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852; *cf. supra* § II.B.1. For instance, the Programmatic Sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose. *Cf. Telegram*, 448 F. Supp. 3d at 373. Similarly, Ripple's promotional materials, such

24

as the "Ripple Primer" and the "Gateways" brochure, were widely circulated amongst potential investors like the Institutional Buyers.  But, there is no evidence that these documents were distributed more broadly to the general public, such as XRP purchasers on digital asset exchanges.  Nor is there evidence that Programmatic Buyers understood that statements made by Larsen, Schwartz, Garlinghouse, and others were representations of Ripple and its efforts.

Lastly, the Institutional Buyers were sophisticated entities, including institutional investors and hedge funds.  SEC 56.1 Resp. ¶ 105.  An "examination of the entirety of the parties' understandings and expectations," including the "full set of contracts, expectations, and understandings centered on the sales and distribution of" XRP supports the conclusion that a reasonable investor, situated in the position of the Institutional Buyers, would have been aware of Ripple's marketing campaign and public statements connecting XRP's price to its own efforts. *Telegram*, 448 F. Supp. 3d at 379.  There is no evidence that a reasonable Programmatic Buyer, who was generally less sophisticated as an investor, shared similar "understandings and expectations" and could parse through the multiple documents and statements that the SEC highlights, which include statements (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority) over an extended eight-year period.

Therefore, having considered the economic reality and totality of circumstances, the Court concludes that Ripple's Programmatic Sales of XRP did not constitute the offer and sale of investment contracts.[17]

---

[17] Because the Court finds that the record does not establish the third *Howey* prong as to the Programmatic Sales, the Court does not reach whether the first or second *Howey* prongs have been satisfied.

**SA-25**

### 3.   Other Distributions

The SEC's last category of XRP offers and sales are "Other Distributions under written contracts for which [Ripple] recorded $609 million in 'consideration other than cash' in its audited financial statements." SEC Reply at 5. These Other Distributions include distributions to employees as compensation and to third parties as part of Ripple's Xpring initiative to develop new applications for XRP and the XRP Ledger. SEC Mem. at 31–32. The SEC alleges that "Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP into public markets." *Id.* at 31.

The Other Distributions do not satisfy *Howey*'s first prong that there be an "investment of money" as part of the transaction or scheme. 328 U.S. at 301. *Howey* requires a showing that the investors "provide[d] the capital," *id.* at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d]" cash, *Telegram*, 448 F. Supp. 3d at 368–69. "In every case [finding an investment contract] the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979). Here, the record shows that recipients of the Other Distributions did not pay money or "some tangible and definable consideration" to Ripple. To the contrary, Ripple paid XRP to these employees and companies. And, as a factual matter, there is no evidence that "Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP," SEC Mem. at 31, because Ripple never received the payments from these XRP distributions.

In its opposition papers, the SEC pivots and argues instead that the Other Distributions were an indirect public offering because "the parties that received XRP from Ripple, such as an '[Xpring] recipient,' could 'transfer their XRP (in exchange for units of another currency, goods,

or services) to another holder.'"  SEC Opp. at 26 (citation omitted).  But the SEC does not elsewhere allege that the recipients of these Other Distributions, like Ripple employees and Xpring third-party companies, were Ripple's underwriters.  In any event, the SEC does not develop the argument that these secondary market sales were offers or sales of investment contracts, particularly where the payment of money for these XRP sales never traced back to Ripple, and the Court cannot make such a finding.

Therefore, having considered the economic reality and totality of circumstances, the Court concludes that Ripple's Other Distributions did not constitute the offer and sale of investment contracts.[18]

#### 4.   Larsen's and Garlinghouse's Offers and Sales

Lastly, the Court addresses Larsen's and Garlinghouse's offers and sales of XRP.  Section 4(a)(1) of the Securities Act exempts "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  The SEC argues that this exemption does not apply to Larsen and Garlinghouse because they are "affiliates" of Ripple and "an affiliate of the issuer—such as an officer, director, or controlling shareholder—ordinarily may not rely upon the Section 4(1) exemption."  *Cavanagh*, 445 F.3d at 111 (cleaned up).

The Court need not reach this issue.  Like Ripple's Programmatic Sales, Larsen's and Garlinghouse's XRP sales were programmatic sales on various digital asset exchanges through blind bid/ask transactions.  *See* SEC 56.1 Resp. ¶¶ 280–84, 306–09.  Larsen and Garlinghouse did not know to whom they sold XRP, and the buyers did not know the identity of the seller.  Thus, as a matter of law, the record cannot establish the third *Howey* prong as to these transactions.  For substantially the same reasons discussed above, *supra* § II.B.2, Larsen's and

---

[18] Because the Court determines that the record does not establish the first *Howey* prong as to the Other Distributions, the Court does not reach whether the second or third *Howey* prongs have been satisfied.

**SA-27**

Garlinghouse's offer and sale of XRP on digital asset exchanges did not amount to offers and sales of investment contracts.[19]

### 5. Defendants' Due Process Defenses

Defendants each assert a "fair notice" defense, claiming that the SEC violated their due process rights; Larsen and Garlinghouse also assert an as-applied vagueness defense based on the same due process principles. *See* Defs. Opp. at 43 & n.28; *see also* ECF No. 51 at 97–99; ECF No. 462 at 97–99; ECF No. 463 at 103–05.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This clarity requirement is "essential to the protections provided by the Due Process Clause of the Fifth Amendment," and "requires the invalidation of laws that are impermissibly vague." *Id.* Laws fail to comport with due process when they (1) "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) are so standardless that they authorize or encourage "seriously discriminatory enforcement." *Id.* (citation omitted).

This "assessment cannot be conducted in the abstract; rather . . . the party claiming a lack of notice [must] show[] 'that the statute in question provided insufficient notice that his or her behavior at issue was prohibited.'" ECF No. 440 at 8 (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)). "[T]he evaluation of any fair notice defense is objective—it does not require inquiry into 'whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.'" *Id.* at 10 n.5 (quoting

---

[19] For the reasons stated, the Court need not address Defendants' argument that Larsen and Garlinghouse are entitled to summary judgment on offers and sales on "foreign exchanges." *See* Defs. Mem. at 58–74.

*United States v. Smith*, 985 F. Supp. 2d 547, 587 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016)).

The Court rejects Defendants' fair notice and vagueness defenses as to the Institutional Sales.  First, the caselaw that defines an investment contract provides a person of ordinary intelligence a reasonable opportunity to understand what conduct it covers.  *See Copeland*, 893 F.3d at 114.  *Howey* sets forth a clear test for determining what constitutes an investment contract, and *Howey*'s progeny provides guidance on how to apply that test to a variety of factual scenarios.  *See Smith*, 985 F. Supp. 2d at 588 ("[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well.").  That is constitutionally sufficient to satisfy due process.  *See United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) ("[T]he abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required.").

Second, the caselaw articulates sufficiently clear standards to eliminate the risk of arbitrary enforcement.  *Howey* is an objective test that provides the flexibility necessary for the assessment of a wide range of contracts, transactions, and schemes.  Defendants focus on the SEC's failure to issue guidance on digital assets and its inconsistent statements and approaches to regulating the sale of digital assets as investment contracts.  *See* Defs. Opp. at 45–52.  But the SEC's approach to enforcement, at least as to the Institutional Sales,[20] is consistent with the

---

[20] Because the Court finds that only the Institutional Sales constituted the offer and sale of investment contracts, the Court does not address Defendants' asserted fair notice defense as to the other transactions and schemes.  The Court's holding is limited to the Institutional Sales because the SEC's theories as to the other sales in this case are potentially inconsistent with its enforcement in prior digital asset cases.  *See Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

enforcement actions that the agency has brought relating to the sale of other digital assets to buyers pursuant to written contracts and for the purpose of fundraising. *See, e.g.*, *Telegram*, 448 F. Supp. 3d 352; *Kik*, 492 F. Supp. 3d 169. Moreover, the law does not require the SEC to warn all potential violators on an individual or industry level. *See Dickerson v. Napolitano*, 604 F.3d 732, 745–46 (2d Cir. 2010) ("Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." (cleaned up)).

Accordingly, the SEC's motion for summary judgment is GRANTED as to the Institutional Sales and otherwise DENIED, and Defendants' motion for summary judgment is GRANTED as to the Programmatic Sales, the Other Distributions, and Larsen's and Garlinghouse's sales, and DENIED as to the Institutional Sales.

### C.  Larsen's and Garlinghouse's Aiding and Abetting of Ripple's Violations

The SEC also moves for summary judgment on its aiding and abetting claim against Larsen and Garlinghouse. *See* SEC Mem. at 66. To establish liability for aiding and abetting a securities violation, the SEC must show:

> (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;
> (2) knowledge of this violation on the part of the aider and abettor; and
> (3) substantial assistance by the aider and abettor in the achievement of the primary violation.

*SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (cleaned up). Courts cannot consider the three requirements in isolation from one another because "[s]atisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance."

**SA-30**

*SEC v. Espuelas*, 905 F. Supp. 2d 507, 517 (S.D.N.Y. 2012) (quoting *SEC v. DiBella*, 587 F.3d

553, 566 (2d Cir. 2009)).  Indeed, courts have found that "'[a] high degree of substantial

assistance may lessen the SEC's burden in proving scienter' and vice versa." *SEC v. Wey*, 246 F.

Supp. 3d 894, 928 (S.D.N.Y. 2017) (quoting *Apuzzo*, 689 F.3d at 215).

 As to the first requirement, the Court has already held that Ripple's Institutional Sales

constituted the unregistered offer and sale of investment contracts in violation of Section 5 of the

Securities Act.  *See supra* § II.B.1.

 With respect to the second requirement, to show knowledge of Ripple's violations, the

SEC must demonstrate Larsen's and Garlinghouse's "general awareness of their overall role in

Ripple's illegal scheme."  MTD Order at 15; *see SEC v. Yorkville Advisors, LLC*, 305 F. Supp.

3d 486, 511 (S.D.N.Y. 2018); Dodd-Frank Wall St. Reform & Consumer Protection Act, Pub. L.

111-203, 124 Stat. 1376, § 929O (2010) (codified at 15 U.S.C. § 78t(e)).  The SEC need not

demonstrate that Larsen and Garlinghouse were aware that Ripple's transactions and schemes

were illegal.  *See SEC v. Mattessich*, 407 F. Supp. 3d 264, 272–73 (S.D.N.Y. 2019).  Rather, the

SEC must show that Larsen and Garlinghouse knew, or recklessly disregarded, the facts that

made Ripple's transactions and schemes illegal under statutory and caselaw.  *See id.*

 Based on the record, Defendants have raised a genuine dispute of material fact as to

whether Larsen and Garlinghouse knew or recklessly disregarded the facts that made Ripple's

scheme illegal.  *See* MTD Order at 15.  It is not clear whether Larsen and Garlinghouse knew or

recklessly disregarded that securities laws, rather than laws under other regulatory regimes,

applied to XRP.  For instance, Larsen and Garlinghouse testified that they did not believe XRP

was a security because multiple foreign regulators, including regulators in Japan, Singapore,

Switzerland, the United Arab Emirates, and the United Kingdom, had determined that XRP was

not a security.  SEC Add. 56.1 Resp. ¶¶ 1744, 1782.  Larsen and Garlinghouse also stated that

when the U.S. Department of Justice and the U.S. Treasury Department's Financial Crimes

Enforcement Network labeled XRP a "virtual currency" in 2015, they understood this as an

"official United States government declaration that XRP [was] a currency" and "exempt from

[U.S.] securities laws."  *Id.* ¶¶ 1734, 1759–60.  Larsen further testified that he understood the

2018 speech by the then-Director of the SEC Division of Corporate Finance, Bill Hinman—in

which he stated that neither bitcoin nor ether (another digital asset) were securities—to further

reinforce the SEC's position that XRP was not a security.  *See id.* ¶¶ 1742–43.

The October 2012 Perkins Coie memorandum, which Larsen reviewed, advises,

"[a]lthough we believe that a compelling argument can be made that [XRP tokens] do not

constitute 'securities' under the federal securities laws, given the lack of applicable [caselaw],

we believe that there is some risk, albeit small, that the [SEC] disagrees with our analysis."

Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6.  Larsen testified that after receiving the

memorandum, Ripple took specific steps to ensure compliance with the advice contained within

the memorandum.  Defs. 56.1 Resp. ¶ 1730.

Likewise, Defendants have raised a genuine issue of material fact as to whether Larsen

and Garlinghouse knew or recklessly disregarded facts about each of the *Howey* elements.  For

example, Defendants have adduced evidence that Larsen and Garlinghouse did not know that

Ripple's Institutional Sales of XRP satisfied the *Howey* "common enterprise" element because

they did not believe that the proceeds from the sales were pooled and understood that Ripple did

not manage, operate, or control the XRP Ledger or the broader "XRP ecosystem."  *See id.*

¶¶ 1748–50.  Based on the disputed facts in the record, therefore, a reasonable juror could find

that Larsen and Garlinghouse did not know or recklessly disregard Ripple's Section 5 violations. *See Apuzzo*, 689 F.3d at 206.

As to the third requirement, Defendants concede that Larsen, as Ripple's CEO prior to 2017, provided substantial assistance, and Garlinghouse, after becoming Ripple's CEO in January 2017, provided substantial assistance. *See* Defs. Opp. at 71. However, Larsen claims that he did not provide substantial assistance during his time as Executive Chairman of Ripple's Board, starting in 2017. *See id.*

To satisfy the substantial assistance component of aiding and abetting, the "SEC must show that the defendant in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (cleaned up). In other words, the defendant must "consciously assist the commission of the specific crime in some active way." *SEC v. Mudd*, 885 F. Supp. 2d 654, 670–71 (S.D.N.Y. 2012) (cleaned up).

Here, Larsen has raised a triable issue of material fact as to whether he provided "substantial assistance" beginning in 2017. *See Anderson*, 477 U.S. at 248. The record establishes that, starting in 2017, Larsen moved away from a day-to-day operational role at Ripple. *See* SEC Add. 56.1 Resp. ¶¶ 1722–29. But after he stepped down as CEO, Larsen also continued his role on the XRP Sales Committee, which approved Ripple's sales of XRP. *See* Defs. 56.1 Resp. Part 2 ¶ 1099, ECF No. 835-1. The Court concludes, therefore, that a reasonable jury could find that, starting in 2017, Larsen did not "consciously assist [Ripple's Section 5 violations] in some active way." *Mudd*, 885 F. Supp. 2d at 670–71 (cleaned up).

Accordingly, the SEC's motion for summary judgment on the aiding and abetting claim against Larsen and Garlinghouse is DENIED.

**SA-33**

## CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment is GRANTED as to the Institutional Sales, and otherwise DENIED.  Defendants' motion for summary judgment is GRANTED as to the Programmatic Sales, the Other Distributions, and Larsen's and Garlinghouse's sales, and DENIED as to the Institutional Sales.

The Court shall issue a separate order setting a trial date and related pre-trial deadlines in due course.

The Clerk of Court is directed to terminate the motions at ECF Nos. 621, 625, 639, 642, 807, 824, and 836.

SO ORDERED.

Dated: July 13, 2023
       New York, New York

_____
ANALISA TORRES
United States District Judge

34

**SA-34**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

|  |  |
|---|---|
| | USDC SDNY |
| | DOCUMENT |
| | ELECTRONICALLY FILED |
| | DOC #: _____ |
| | DATE FILED: 08/07/2024 |

                              Plaintiff,

         -against-

RIPPLE LABS, INC.,

                              Defendant.

20 Civ. 10832 (AT)

**JUDGMENT**

ANALISA TORRES, District Judge:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant, Ripple

Labs, Inc., is permanently restrained and enjoined from violating Section 5 of the Securities Act

[15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means

or instruments of transportation or communication in interstate commerce or of the mails to sell

such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be

carried through the mails or in interstate commerce, by any means or instruments of

transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of

any prospectus or otherwise any security, unless a registration statement has been filed with the

Commission as to such security, or while the registration statement is the subject of a refusal

order or stop order or (prior to the effective date of the registration statement) any public

proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

**SA-35**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of **$125,035,150** pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]. Defendant shall satisfy this obligation by paying **$125,035,150** to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Ripple Labs, Inc. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

**SA-36**

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 et seq., and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not further benefit by, offset or reduction of any award of compensatory damages in any Related Investor Action by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order

**SA-37**

granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount

of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.

Such a payment shall not be deemed an additional civil penalty and shall not be deemed to

change the amount of the civil penalty imposed in this Judgment. For purposes of this

paragraph, a "Related Investor Action" means a private damages action brought against

Defendant by or on behalf of one or more investors based on substantially the same facts as

alleged in the Complaint in this action.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment for one

year from its date of entry.

SO ORDERED.

Dated: August 7, 2024
      New York, New York

                                                      ANALISA TORRES
                                       United States District Judge

**SA-38**

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the Court's ACMS system. All parties and counsel of record were served with copies of the foregoing brief on the same date through the Court's ACMS system.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: January 15, 2025